Filed 6/24/13  P. v. Jaques CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E053356 |
| v. | (Super.Ct.No. SWF028160) |
| JAMES DALE JACQUES, Jr., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Thomas Kelly, Judge.

(Retired judge from Santa Cruz Super. Ct. assigned by the Chief Justice pursuant to art.

VI, § 6 of the Cal. Const.)  Affirmed.

Steven S. Lubliner, under appointment by the Court of Appeal for Defendant and

Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Collette C.

Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant, James Jacques, Jr., of transporting more than 28.5 grams of marijuana (Health & Saf. Code, § 1360, subd. (a)[1] and possessing marijuana for sale (§ 11359). He was granted probation and appeals, claiming that the defense of being part of a medical marijuana collective is unconstitutionally vague, evidence was improperly admitted, the evidence was insufficient and the jury was misinstructed. We reject his contentions and affirm.

## FACTS

On May 1, 2009, a police officer stopped the car defendant was driving for a vehicle violation. Defendant said he had no identification. Defendant said his nephew had rented the car. Defendant confirmed that he was on probation out of another county for a drug offense. Defendant said he was a drug registrant at an address in Temecula, but he was not living at that address at the time. He had fourteen $5.00 bills, one $10.00 bill and a cell phone on him. He said there was marijuana in the glove box, but it belonged to his passenger, and the passenger confirmed this.[2] Defendant said he had a medical marijuana card that allowed him to use and possess marijuana, but he did not have the card with him and he never showed one to the officer. He never provided proof

---

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

[2] The passenger said he had a medical marijuana card and he showed the officer paperwork from a doctor's office, but he was eventually cited for possessing this marijuana because the officer could not verify that the passenger possessed the marijuana for a medical purpose. The passenger also admitted owning a marijuana pipe, which the officer found on the passenger side floor of the car.

that he had such a card.  In the trunk of the car, which emitted the odor of marijuana, the officer found, inter alia, a clothing bag, which defendant said belonged to his nephew. Defendant said there were a couple of pounds of marijuana in the bag.  The officer saw what appeared to him to be marijuana in five plastic baggies, each weighing approximately one pound, in the bag.[3]  Defendant said his nephew had a medical marijuana recommendation and was a primary caregiver and dispensed medical marijuana, which was allowed by the authorization the nephew had.  He said the marijuana in the vehicle was for dispensing to medical clients and his nephew dispensed marijuana.  There was one $100 bill and eighty $20 bills in the zipped side pouch of the bag.  Defendant said the money was not his—that it must belong to his nephew.  In another bag in the trunk was a scale.[4]  Defendant also said that his medical marijuana card allowed him to be a primary caregiver,[5] so the amount of the marijuana "wasn't a concern" and it was "legal for him to possess."  However, defendant never said the marijuana was his, but that it belonged to his nephew.  He also never mentioned a collective.

---

[3]  This officer's partner testified that the marijuana weighed a total of 6 pounds, 10 ounces.

[4]  The People appear to imply, in their statement of facts, that this bag was not found in the trunk of the car.  However, our reading, defendant's and the prosecutor's is that it was.

[5]  As already stated, defendant never showed a card to the officer.

After defendant was arrested, he directed the officer and the officer's partner to a home in Lake Elsinore where he claimed he was currently living. Defendant did not have the key to the home, but claimed he went in and out through a rear sliding glass door. They entered through the unlocked rear sliding glass door and defendant took the officers to an upstairs bedroom which appeared to be a child's room. No clothing or possessions inside the room linked defendant to it.

Defendant's cell phone contained several text messages, one of which appeared to be from a person who was asking defendant about the purchase of marijuana. The sender identified herself as "' . . . Sarah, Nate dog and Sarah's friend." She asked, "Just wondering about some mary? You get texts?'" Another text, which had been sent by a man who eventually testified for defendant at his trial, said, "'Hey, it's Matt. Can I get a quarter instead of the 40[?]'" A text from a third number said, in part, "'I'm getting mad complaints about the last three drop offs.'" A text from another person who eventually testified for the defense at this trial said, "'My buddy with his card is coming over. Can I get an extra two O's . . . ?[']'"[6] Two other texts from the same person said, "'Could you deliver a O tonight. I'd be willing to meet you close to you. My friend is flaking again but tomorrow is a big day.'" Another text from the same person asked, "'How much for QP, BTW?'"[7] Yet another said, "'I'm going to grab a dr[i]nk from inside while you weigh that out.'" A text from another number asked, "'Is it cool to give JP the cash I owe

---

[6] The officer opined that this meant two ounces and the text sender concurred.

[7] The sender of this text testified at trial that he was asking defendant how much defendant would charge for a quarter pound of marijuana.

you and just grab two more[?]'" Another text from that same number said, "'Are you busy? Your friends are getting bored. Can I get two this time for 550?'" The officer opined that all of these texts referred to the sale of marijuana.

Defendant's nephew testified that defendant stayed at the nephew's Lake Elsinore home about two nights a week. The nephew said he was a medical marijuana patient and had a recommendation from a doctor. He also said he had a caregiver card. However, he denied being in any group with defendant regarding growing marijuana and he denied growing marijuana with defendant. He admitted that defendant had given him marijuana from time to time. He said that defendant apologized to him for saying that the nephew owned the marijuana that was found in the car. The nephew denied any knowledge of the marijuana in the car and he denied that the marijuana or the money that was there was his. He said he had rented the car for defendant's use because defendant did not have a credit card.

Defendant's passenger testified that defendant had a marijuana delivery service and defendant delivered marijuana to the passenger. The marijuana in the glove box was the passenger's, which he was authorized by a doctor to have. He denied knowledge of or ownership of the marijuana that was found in the trunk. He testified that defendant told him that it was defendant's. He said he would buy one-quarter of an ounce of marijuana from defendant each month for $140,[8] he showed defendant his medical marijuana card and defendant had him fill out paperwork before defendant gave him

---

[8] He testified that this was about what other dispensaries charged him.

marijuana. Also, before he got marijuana from defendant, the passenger and defendant had a discussion about the obligations of medical marijuana patients—that the marijuana could not be used for anything other than medical purposes. However, there was no discussion that the recipient of the marijuana could not share it with someone who was not a medical marijuana patient, although the passenger had been aware of this fact since 2006. At one point, defendant had given him some marijuana as a sample and did not charge him for it. He thought defendant had given him paperwork, but he was unable to locate it. However, he claimed to have signed something he had not read. He thought he had designated defendant as his primary caregiver, but he was not certain. However, the extent of their relationship was that when the passenger needed marijuana, he would call defendant and defendant would bring him marijuana, which the passenger would pay for. To his knowledge, he was not part of a group that grew marijuana that included defendant. He did not know where defendant obtained the marijuana he provided to him. Defendant never told him to what use the money the passenger gave defendant for the marijuana defendant supplied to him was put.

A female who had obtained marijuana from defendant in exchange for money testified for the prosecution that while at her doctor's office, getting a marijuana recommendation, she was given defendant's business card. She called defendant and he told her that he would have to call her doctor's office, then call her back. Ten minutes later, he called her back and asked her how much marijuana she wanted. In response to her question, he said he had two kinds and she asked him to bring both so she could try each. He said each cost $50 for an eighth of an ounce. At defendant's direction, they

6

met at a pancake house.  Defendant had marijuana edibles he showed her.  He told her he was a primary caregiver, he took care of a lot of people,  and he was starting a co-op.  Defendant asked for and was given a copy of her recommendation.  However, she signed no paperwork and saw none.  He showed her a card, which bore a star, and he had previously told her that a star on your card meant that you were a primary caregiver.  However, she did not designate him as her primary caregiver.  He did not call the money she gave him for the marijuana a donation.  She denied being a member of a group.  Defendant told her that he supplied marijuana to dispensaries.  When he handed her the marijuana, it was in two sandwich baggies, which she pulled up to see the contents.  He slapped her hand and said, ["I]t ain't that legal.["]

An expert testified for the prosecution that illegal co-ops or dispensaries sell marijuana at a profit for about $20 or more a gram, which was about the price for marijuana on the street.  Legal marijuana can be grown for the patient's own use or in a collective or cooperative.  He said that people who operate legal collectives like to talk about their organization and the members know each other.  A collective is usually comprised of a person who owns land or a garage and a certain number of members.  All members of the collective contribute labor and/or supplies or the money to purchase them to grow the marijuana.  Together they harvest and process the marijuana, then divide it up amongst themselves.  To legally be a member of a collective, one has to have a medical marijuana recommendation.  Collectives are not allowed to operate for profit, and the Attorney General's Guidelines so provided.  The only valid price for marijuana offered by a legitimate collective is the actual cost to produce it and get in the hands of the

patient.  It costs between $300 and $800 to grow one pound of marijuana indoors and less to grow it outdoors, and that would include the cost of labor, which should not be a factor in a collective, since the members supply the labor.  In his opinion, charging $250 per ounce is more than the cost of operating and overhead.  Marijuana is the most profitable drug to sell.  Based on the testimony of three witnesses who testified for the defense, whose testimony will be described *infra*, he opined that what defendant was doing was not a legal collective.  This was because defendant was selling the marijuana at a profit, he did not have an on-going relationship with these people and met them in parking lots and sold quantities of one-eighth of an ounce at a time and there was no indication that these people were in any group collective setting or were working together and they did not know each other.  He also opined that one person could not constitute a collective and it would make no sense for a collective to offer quantity discounts.  Based on what the defense witnesses said they gave defendant in exchange for the marijuana he supplied them, the marijuana found in the trunk had a value of between $25,920 and $53,760.  He opined that defendant's distribution of marijuana was for profit in part because what he was charging in the text messages exceeded the cost of growing marijuana.  He explained that the text messages found on defendant's phone also suggested that he was not part of a legal collective in that the prices quoted in them were too high.  Additionally, people operating in a collective have a ongoing relationship with each other and contribute towards and divide up the yield of the crop and the text senders were not doing this—they were calling defendant and telling him they needed a certain amount of marijuana.  The fact that the defense witnesses testified that each paid a different amount from the other

for marijuana supplied by defendant also suggested that the asserted collective was not legal. He allowed that members of a collective may legally contribute money to the collective, but that money had to be used to buy things necessary for the growing or distribution of the marijuana to members of the collective. According to the Attorney General's Guidelines, compensation for overhead costs had to be reasonable. Only a primary caregiver can be compensated for his or her efforts and labor in growing the marijuana. Collective members can agree that each member will receive a different amount of marijuana than the other members receive. Based on his knowledge and experience, people who wanted to join a collective first had to have their status verified by the collective, they had to agree not to distribute marijuana to non-members and to agree to use it only for medical purposes and their records had to be accessible to the collective. Based on a hypothetical containing the facts of this case, he opined that defendant possessed the marijuana for sale. He based this on the facts that there was over six pounds of marijuana in the trunk and scales "to meet whatever the need is when you get the calls[,]" the presence of the $20 bills, which are the most common denominator when dealing in street level narcotics, the text messages asking about getting ounces and how much would be charged for a quarter pound and defendant's prior conviction for possessing cocaine for sale. Other aspects of his testimony are described elsewhere in this opinion.

Evidence concerning defendant's prior conviction of a drug offense is described elsewhere in this opinion.

A female medical marijuana patient testified for the defense that in 2008, she joined a group of similar patients, of which defendant was also a member. However, she admitted that she knew none of the other members of the group and did not know how many people were in the group. She and defendant verbally agreed that he would supply her with marijuana. She showed defendant her medical recommendation. Before she joined the group, she and defendant went over the rules, which were that the marijuana she received was for her use only, she could not share it with others, she could not sell it and she was to treat it as medicine. She termed the money she gave defendant for the marijuana he gave her a donation and she believed she was contributing to the group by paying this money, although she admitted telling representatives of both the prosecutor's office and the defense team that she *bought* marijuana from defendant and she did not mention the word "donation." She asserted that defendant's organization was a non-profit, but she did not explain how she knew this.[9] She always paid defendant $270 per ounce and she obtained about one ounce per week. She would call defendant, he would bring her marijuana and she would give him money. She did not know where defendant grew the marijuana he supplied to her, but she "knew" he was growing it himself, although she did not know how, and the money she gave him was to cover the cost of this. However, defendant never discussed with her crop yields or costs. She asserted that the marijuana found in the trunk was to go to her and other members of the group, but, again, she did not explain how she knew this. She asserted that defendant was her

---

[9] Another defense witness testified that defendant had told him that the group was nonprofit.

primary caregiver, however, she also said that he only provided her with medical marijuana and did nothing else for her. She added that she knew that a legal caregiver is a person who takes the patient to the doctor, and defendant did not do that for her, so defendant was "not her caregiver in the legal" sense.

A male medical marijuana user testified for the defense that he contacted defendant when a friend told him that the friend was getting his marijuana from defendant. He asserted that he joined a group of medical marijuana patients, but he admitted that he did not know any of the other members of the group. He also admitted that he had no idea what role anyone in the group played other than defendant supplying marijuana. On one occasion, he saw defendant doing paperwork, but he otherwise saw no logging being done by defendant. He said that his first meeting with defendant occurred when he and defendant met a place away from the witness's home and he got into defendant's car "because [the witness] lived in a gated community." He showed defendant his recommendation and gave him a copy of it. He asserted that this information was verified but he did not explain how he knew this. Defendant described the "rules," which were that marijuana could not be given to anyone who did not have a card or to anyone outside the group (but anyone could join the group) and the marijuana was to be treated as medicine. He asserted that he gave defendant "donations" for the marijuana, which he considered to be his contribution to the group. Defendant did not tell him that defendant, himself, grew the marijuana and the witness did not know defendant's source for it. He allowed that defendant may have gotten it from someone else and not grown it himself. He used two ounces or less a month and gave defendant

11

$10 per gram, or about $275 per ounce. He said that in response to his text message about how much a quarter pound would cost, defendant offered a discount for larger quantities, but this witness never took advantage of it. The witness did nothing to help cultivate the marijuana. He designated defendant as his primary caretaker, but defendant never provided him with anything other than marijuana. This witness admitted that after he joined the group, he sent defendant the text message that said, "My buddy with his card is coming over. Can I get an extra two O[unces]s?" He admitted that at the time, his buddy was not a member of the group. He also admitted sending the text message in which he asked defendant to deliver an ounce that night, that he would be willing to meet defendant close to where defendant was and that his friend was "flaking again" but that tomorrow was a big day, which meant that tomorrow was pay day. This witness was never told how much marijuana the group had or about its finances. He said that none of the marijuana found in the trunk was his, but he "supposed" that, as a member of the group, he was entitled to "a little bit" of it. He said that defendant had given him a gram of marijuana and an edible as a gift, but other than that, he always gave a "donation" for every ounce of marijuana he obtained from defendant.

A second male medical marijuana patient also testified for the defense that he discovered defendant on a web site. He asserted that he joined a group of like patients, of which defendant was also a member, but he never met any of the other members. Defendant did not tell him whether defendant, himself, grew the marijuana. He admitted that he did not know if defendant grew the marijuana himself—in fact, he believed that defendant got it from medically licensed growers and caregivers. This witness knew

12

nothing about the yields, prices or finances of the group. At their first meeting, this witness showed defendant his medical marijuana card from Riverside County, his doctor's recommendation and he gave defendant a copy of the card. Defendant showed his defendant's medical marijuana card from Riverside County. He asserted that defendant "t[oo]k some steps to verify" that he was a medical marijuana patient, but he did not explain how he knew this. Defendant explained the rules—that a member cannot redistribute marijuana to others or share with non-medical marijuana patients or drive under the influence. The marijuana was to be treated like medicine. This witness offered a certain amount of money as a donation "to the group" and defendant told him the amount of marijuana he would give him in exchange for this. He admitted that after joining the group, he sent the text in which he asked for a "quarter" instead of a "40." He explained that he meant that he usually donated $40, but on this day he could donate $100 to get a quarter of an ounce. He got two and one-half grams for a $40 donation, but if he was really in pain, defendant would give him more. He also received a discount for quantities. He never designated defendant as his primary caretaker and he had no interaction with defendant other than defendant giving him marijuana in exchange for money. In a particularly poignant moment during his testimony, he was asked how the facts that he called defendant, defendant brought him marijuana, he gave defendant cash and defendant gave him marijuana were "different than a purchase and a sale[.]" He responded, "I don't know."

1. *Constitutionality of the Collective Defense*

"In 1996, voters passed Proposition 215, the Compassionate Use Act of 1996 [citation]. One purpose of the CUA was to 'ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment' of illnesses for which marijuana provides relief. [Citations.] A second purpose was to ensure that patients and their primary caregivers who obtain and use medical marijuana are not subject to criminal prosecution or sanction. [Citation.] The CUA therefore provided that section 11357, relating to the possession of marijuana, and section 11358, relating to the cultivation of marijuana, 'shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient' upon a doctor's recommendation. [Citation.] The CUA thus provided a limited immunity from prosecution, including a defense at trial. [Citation.] [¶] In response to the CUA's encouragement 'to implement a plan to provide for the safe and affordable distribution of marijuana to all patients' in need of it [citation], our Legislature enacted the M[edical] M[arijuana] P[rogram] A[ct] [citation]. Through the MMPA, the Legislature sought to '(1) [c]larify the scope of the application of the act and facilitate the prompt identification of qualified patients and their designated primary caregivers in order to avoid unnecessary arrest and prosecution of these individuals and provide needed guidance to law enforcement officers. [¶] (2) Promote uniform and consistent application

14

of the act among the counties within the state. [¶] (3) Enhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects.' [Citation.]  To these ends, section 11362.775 of the MMPA provides, 'Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, *who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes*, shall not solely on the basis of that fact be subject to state criminal sanctions under Sections 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570.'  [Citation.]" (*People v. Colvin* (2012) 203 Cal.App.4th 1029, 1035 (*Colvin*).)

The *Colvin* court went on to say, "The Legislature also enacted section 11362.765, which provides: '(a) Subject to the requirements of this article, the individuals specified in subdivision (b) shall not be subject, on that sole basis, to criminal liability under Sections 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570.  However, nothing in this section shall authorize the individual to smoke or otherwise consume marijuana unless otherwise authorized by this article, *nor shall anything in this section authorize* any individual or *group to cultivate or distribute marijuana for profit*.  [¶]  '(b) Subdivision (a) shall apply to all of the following:  [¶]  '(1) A qualified patient or a person with an identification card who transports or processes marijuana for his or her own personal medical use.  [¶]  '(2) A designated primary caregiver who transports, processes, administers, delivers, or gives away marijuana for medical purposes . . . , only to the qualified patient of the primary caregiver, or to the person with an identification card who has designated the individual as a primary caregiver.  [¶]  '(3) Any individual

who provides assistance to a qualified patient or a person with an identification card, or his or her designated primary caregiver, in administering medical marijuana to the qualified patient or person or acquiring the skills necessary to cultivate or administer marijuana for medical purposes to the qualified patient or person.  [¶]  '(c) *A primary caregiver who receives compensation for actual expenses*, including reasonable compensation incurred for services provided to an eligible qualified patient or person with an identification card to enable that person to use marijuana under this article, *or for payment for out-of-pocket expenses incurred in providing those services, or both*, shall not, on the sole basis of that fact, be subject to prosecution or punishment under Section 11359 or 11360." (*Colvin*, *supra*, 203 Cal.App.4th at p, 1035, fn. 7, italics added.)

"This [last] section thus allows a primary caregiver to receive compensation for actual expenses and reasonable compensation for services rendered to an eligible qualified patient . . . ." (*People v. Urziceanu* (2005) 132 Cal.App.4th 747, 784, 785.)

Section 11362.7, subdivision (d) provides, in pertinent part, "'Primary caregiver' means the individual, designated by a qualified patient or by a person with an identification card, who has *consistently assumed responsibility for the housing, health, or safety of that patient or person* . . . ." (§ 11362.7, subd. (d), italics added.) Subdivision (f) provides, "'Qualified patient means a person who is entitled to the protections of Section 11362.5, but who does not have an identification card issued pursuant to this article." Subdivision (g) provides, "'Identification card' means a document issued by the State Department of Health Services that . . . identifies a person

16

authorized to engage in the medical use of marijuana and the person's designated primary caregiver, if any."

A provision of the Medical Marijuana Program Act (MMPA) "directs the Attorney General to develop and adopt appropriate guidelines to ensure the security and nondiversion of marijuana grown for medical use by patients qualified under the CUA." (*Colvin*, *supra*, 203 Cal.App.4th at p. 1040, fn. 11.) "Those guidelines are entitled to considerable weight but do not bind us. [Citation.]" (*Ibid*.)[10]

Defendant contends that the collective defense is unconstitutionally vague. However, there is a strong presumption that legislative enactments must be upheld against such a challenge unless their unconstitutionality appears clearly, positively and unmistakenly. (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 568.) If any reasonable or practical construction can be given to its language, it is not void for vagueness. (*Ibid*.)

Specifically, defendant contends that the defense to possession of marijuana for sale and to transportation of marijuana available to a collective is vague because section 11362.775 does not define a collective. However, "[a]ll that is required is that the statute be reasonably certain so that persons of common intelligence need not guess at its meaning. [Citation.] 'The requirement of reasonable certainty does not preclude the use

---

[10] Those guidelines may be found at http://ag.ca.gov/cms_attachments/press/pdfs/n1601_medicalmarijuanaguidelines.pdf. We grant defendant's motion to take judicial notice of those guidelines.

Some provisions of those guidelines were incorporated into the jury instructions concerning the defense that defendant was transporting and possessing marijuana for a collective. The prosecution's expert testified, during cross-examination by defense counsel, that these guidelines were "authority."

17

of ordinary terms to express ideas which find adequate interpretation in common usage and understanding.' [Citation.]" (*People v. Silver* (1991) 230 Cal.App.3d 389, 393, 394.) Section 11362.775 provides a defense for patients, card holders and their primary caregivers who associate in order to collectively or cooperatively cultivate marijuana for medical purposes. The fact that the word "collective" is used colloquially to refer to this defense does not necessitate it being defined. What action is required is clear in the statute itself, i.e., the members must come together in order to cultivate marijuana.[11]

Defendant also criticizes the MMPA for failing to define "profit" which neither an individual nor a group is allowed to make in the cultivation or distribution of medical marijuana. (§ 11362.765, subd. (b).) First, any reasonable person knows what profit means—it is whatever money is made from the sale of goods or services that is above and beyond the actual costs of those goods or services. Additionally, as stated above, the act allows a primary caregiver to receive compensation for "actual expenses, including reasonable compensation incurred for services provided . . . to enable [the patient or card holder] to use marijuana" and for "out-of-pocket expenses in providing those services . . . ." (§ 11362.765, subd. (c).) If any clarification of the notion of "profit" is required, section 11362.765, subdivision (c), as reiterated above, provides it.

---

**11** Defendant adds that the guidelines promulgated by the Attorney General are mere guidelines, lacking the force of rules or regulations and that many are termed as suggestions rather than commands. (But see text prior to fn. 10, *ante*, p. 18.) For the sake of this argument, only, we will accept defendant's premise and ignore the guidelines.

Next, defendant asserts that because he "complied with what appears to be the overarching concern of the MMPA by not providing marijuana to non-patients, the law is unconstitutionally vague in light of his personal situation." However, defendant's premise is incorrect. He does not cite any authority that sets forth what the "overarching concern" of the MMPA is.[12] As the jury was instructed, a collective "cultivate[s]

---

[12] Appellate counsel provides two pages of statements as to the problems caused by the Compassionate Use Act (CUA) which the MMPA was designed to address and the legislature's intent in enacting it; however, he provides no citation to any authority for these statements. *People v. Hochanadel* (2009) 176 Cal.App.4th 997, 1007, 1008, states, "The express intent of the Legislature was to: "(1) Clarify the scope of the application of the [CUA] and facilitate the prompt identification of qualified patients and their designated primary caregivers in order to avoid unnecessary arrest and prosecution of these individuals and provide needed guidance to law enforcement officers. [¶] (2) Promote uniform and consistent application of the [CUA] among the counties within the state. [¶] (3) Enhance the access of patients and caregivers to medical marijuana through *collective, cooperative cultivation projects*. [¶] (c) It is also the intent of the Legislature to address additional issues that were not included within the [CUA], and that must be resolved in order to promote the fair and orderly implementation of the [CUA]." [Citation.] The legislative history further states, "*Nothing in [the MMPA] shall amend or change Proposition 215, nor prevent patients from providing a defense under Proposition 215 . . . . The limits set forth in [the MMPA] only serve to provide immunity from arrest for patients taking part in the voluntary ID card program, they do not change Section 11362.5 (Proposition 215) . . . .*" [Citation.] [¶] Of relevance to this appeal, the MMPA added section 11362.775, which provides: 'Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under Section 11357 [possession of marijuana], 11358 [cultivation of marijuana], 11359 [possession for sale], 11360 [transportation], 11366 [maintaining a place for the sale, giving away or use of marijuana], 11366.5 [making available premises for the manufacture, storage or distribution of controlled substances], or 11570 [abatement of nuisance created by premises used for manufacture, storage or distribution of controlled substance].'" (*Hochanadel,* at pp. 1007-1008.) We detect nothing in this that creates an "overarching concern" within which defendant's activities fit.

marijuana solely for the medical benefit of the members of the collective" and "[c]ontributing members of a collective may only distribute marijuana to other contributing members of the collective." Both of these requirements are reasonable inferences from the express provisions of the MMPA.[13] Defendant did not challenge them below. The evidence, however, shows that defendant sold to persons who were not members of the collective the defense alleged existed. Therefore, defendant does not persuade us that the fact that he provided some marijuana to those with cards or recommendations means that the MMPA is vague as applied to him. Moreover, there was evidence, i.e., the texts, that he was in the business of supplying marijuana to those for whom there was no evidence that they had either a card or a recommendation. Finally, as the People correctly point out, this particular constitutional challenge, which requires an assessment of the facts, is forfeited because it was not raised below. (*In re Sheena K.* (2007) 40 Cal.4th 875, 886, 887.)

---

[13] The MMPA provides limited immunity, as is pertinent here, 1) to a qualified patient or card holder who transports or processes marijuana for his or her own personal medical use and, 2) to a designated primary caregiver who transports, processes, administers, delivers or gives away marijuana to that caregiver's qualified patient or card holder, the marijuana is for a medical purpose and the amount does not exceed that provided in section 11362.77, subdivision (a). (MMPA, § 11362.765, subd. (b)(2).) Only qualified patients, cardholders and designated primary caregivers of patients and cardholders can form and maintain a collective in order to receive limited immunity under section 11362.775. Therefore, to claim the collective defense as to any recipient of the collective's medical marijuana, a designated primary caregiver can supply it only to members of the collective for whom he or she is the designated primary caregiver.

20

## 2. Admission of Evidence

### a. *Prior Acts*

Before trial began, the People moved, pursuant to Evidence Code section 1101, subdivision (b),[14] to be permitted to introduce into evidence that in March 2007, defendant was pulled over by a police officer for an equipment violation and when asked if there was anything in the car he was driving, he said not that he knew of. He claimed the car belonged to his daughter. After defendant was arrested for driving on a suspended license and an outstanding warrant, police found a baggie containing four grams of marijuana, another bag containing 27 grams of cocaine and a digital scale. Defendant admitted that the marijuana was his, but denied knowledge of the cocaine, although he said that his fingerprints would probably be inside the box that contained the bag of cocaine. He said the box did not belong to his daughter. Defendant then said that he had found the box in a restaurant parking lot, and variously described where it had been situated. He said he saw something black sticking out of the box, and, hoping it was money, pulled it out. However, it was the scale. For reasons he claimed not to know, he put the scale where it was found in the car by police and the box on the passenger floorboard, intending to open the later and look inside when he got home. Then, he changed his story, saying that his fingerprints might be inside the box and on the bag containing the cocaine because he glanced inside the box. However, he denied selling

---

[14] That subdivision provides, in pertinent part, "Nothing in this section prohibits the admission of evidence that a person committed a crime . . . or other act when relevant to prove some fact such as . . . intent, . . . plan, . . . [or] absence of mistake or accident . . . other than his or her disposition to commit such an act."

21

cocaine. First, defendant said he never used any illegal drugs other than marijuana, then changed his story, admitted that he had used cocaine in the 1970's. As a result of this incident, defendant pled guilty to possessing cocaine for sale.

The People asserted that the foregoing was relevant to show that during the instant offenses, defendant intended to sell marijuana, if defendant planned to claim at trial that he did not intend to sell the marijuana or that it belonged to someone else. The People also asserted that this evidence was relevant to show a common plan or scheme, of which the instant offenses were part.[15] The similarities the People noted between the 2007 incident and the instant one were that in each, defendant, 1) had a substantial amount of contraband and more than for personal use, 2) was in a car he claimed he borrowed from a family member, 3) was in possession of a scale, 4) initially denied that the contraband was his, and 5) possessed marijuana. The People also asserted that the probative value of this evidence outweighed its prejudicial impact.

As is relevant here, defendant asserted in his written motion in limine only that the prejudicial impact of this evidence outweighed its probative value. At the hearing on the motion, he reiterated this position.

The trial court ruled that the evidence was admissible, without elaboration. The jury was instructed that evidence of defendant's conviction of possessing cocaine for sale could be considered only for the purposes of determining defendant's intent to sell, his

---

[15] The People added another theory of admissibility during the hearing on the motion, i.e., that the prior proved defendant's knowledge in this case of the presence of the marijuana and its nature.

22

knowledge of the nature of the marijuana[16] and whether he had a plan or scheme to commit the instant offenses. Defendant contends that this ruling constituted an abuse of discretion. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.) However, he makes this argument on bases he did not advance below, i.e., that the prior is irrelevant because in the instant case, defendant conceded that he knew he possessed marijuana and that he intended to exchange it for something of value and he intended to transport it to facilitate its use. Therefore, defendant abandoned these bases. (Evid. Code, § 353.)

Moreover, his position lacks merit. While the defense attempted to mount a collective defense, the jury was free to reject it. Once they rejected it, they were left with determining whether the elements of each crime had been established by the People beyond a reasonable doubt. This included his intent to sell the marijuana. Absent a stipulation by him that he intended to sell the marijuana, which he never entered into, the People still bore the burden of proof as to this element. Unfortunately for defendant, in mounting a collective defense, he contradicted the statements he made to the officer who stopped him.[17] However, those statements were admissible, they were admitted and the People had the right to rebut his denial of intending to sell the marijuana. Defendant does not assert, nor can he, that the evidence at issue was irrelevant to this element. We agree with defendant that the evidence was prejudicial. However, that did not mean that the trial court abused its discretion in admitting it.

---

[16] See footnote 15, *ante*, page 23.

[17] No doubt, this was probably one of the primary reasons the jury rejected it.

23

b. *Prosecution Expert's Testimony*

The prosecution's expert testified that illegal dispensaries or cooperatives sell marijuana for about $20 a gram, which is roughly the street price. He said that the most popular legal source of medical marijuana for patients is a collective. He was then asked whether, over the years, he has seen the types of medical marijuana defenses change. He said he had. There was no objection by defense counsel. He was then asked what was originally the predominant medical marijuana defense for people who were actually distributing marijuana for profit. Defense counsel objected on the basis of relevancy and was overruled. The expert went on to respond that for-profit distributors claimed to be caregivers, but that was no longer used because guidance was provided about what it took to be a caregiver and they did not meet the criteria. He testified that after the caregiver defense went by the wayside, the cooperative defense began to be used; however, it was no longer popular because a legal definition of a cooperative had arisen, and "people typically who are dispensing marijuana" did not fit within that definition. He then testified that the defense that arose after cooperative was the collective defense.[18] Defendant did not object to any of this testimony.

We agree with defendant that the trial court abused its discretion in overruling his objection to the question about the original defense used by people who were distributing

---

[18] In the interest of clarity, according to the guidelines of the Attorney General, a cooperative "'must file articles of incorporation with the state . . . must follow strict rules on organization, articles, elections, and distribution of earnings, and must report individual transactions from individual members each year.'" (*Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 747.)

24

marijuana for profit. It was irrelevant that others had tried to claim this defense in the past. However, defendant attempted, somewhat, to claim it for himself, and definitely claimed it on behalf of his nephew, when he was stopped by the officer. Given this and the overwhelming evidence against defendant, we cannot agree that there is a reasonable probability that but for the admission of this evidence, defendant would have enjoyed a more favorable outcome. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

3. *Sufficiency of the Evidence*

    a. *Marijuana*

Defendant contends there was insufficient evidence that the substance found in the trunk of the car defendant was driving on May 1, 2009 was marijuana. We disagree. As defendant concedes, the officer who stopped defendant testified that the odor of marijuana came from the trunk.[19] Defendant now wishes to call the ability of this officer to identify the odor of marijuana into question, based on his qualifications in the field of "controlled substances," rather than marijuana, specifically, and to assert, therefore, that his opinion was insufficient to support this element of the offenses.[20] In so doing, defendant ignores the following evidence: he told this officer that "there was a couple of pounds of *marijuana* in the bag" in the trunk. Defendant also told this officer that he had

---

[19] This officer also opined that what was in the trunk was marijuana, an opinion defendant ignores here. However, we assume that his criticism of the officer's opinion that the trunk smelled of marijuana applied equally to the officer's opinion that what was in the trunk was marijuana.

[20] In doing so, however, defendant ignores the officer's testimony about his training and experience "regarding identifying controlled substances *such as marijuana*."

25

a "medicinal card that allowed him to be a primary caregiver so the amount of the *marijuana* found wasn't a concern." Despite this, defendant also told this officer "that the *marijuana* [in the trunk] was not his marijuana" and "the *marijuana* . . . was for medicinal purposes for [his nephew] dispensing it to medicinal clients . . . ." Defendant's nephew testified that defendant told him that he had told the police that "the *marijuana* in the trunk" belonged to the nephew. Defendant's passenger testified that defendant told him that " the *marijuana* in the back of the vehicle [was his]." The passenger also testified that defendant told him that he was fighting this case because he wanted to get "his *marijuana*" back.[21] One of defendant's witnesses testified that she was aware that there was "several pounds . . . [¶] [of] *marijuana*" in the trunk of the car. Another defense witness testified that he had heard that defendant had been apprehended with "a large sum . . . [¶] . . . [¶] [of] *marijuana*" in the trunk of the car. He testified that defendant told him that he had been arrested and "everything that he had on him including *the marijuana* was taken." Finally, the officer's partner testified that what was in the trunk was marijuana. Defendant advances no attack here on this witness's ability to identify marijuana. All the foregoing more than sufficiently supports the jury's implied finding that the substance found in the trunk was marijuana.

As background to this issue, before trial began, the parties discussed the People's list of anticipated witnesses. Defense counsel asked that any witness who was going "to talk about what the substance [in the trunk of the car] was" be excluded because "[he and

---

[21] Only the marijuana in the trunk was the subject of this prosecution.

26

the prosecutor] tentatively reached an agreement that . . . [the] substance . . . was marijuana . . . ." In response, the prosecutor said that he was removing two potential witnesses from the list, one who was to testify about the chain of custody for the marijuana and another who was to testify that she determined that the substances was, in fact, marijuana. During trial, there were numerous referrals to the substance found in the trunk as marijuana by the prosecutor, *defense counsel* and the witnesses *on both sides*.[22] All these references were heard by the jury, without any objection by the defense. When jury instructions were discussed, the prosecutor said he exorcised from the instructions on both charged offenses the description of marijuana "because I believe we have a stipulation that it's marijuana" to which defense counsel agreed. Therefore, while the element that the substance defendant possessed or transported was marijuana was left in the instructions for both offenses, missing from those instructions was the definition of marijuana in the standard instructions.[23] During argument to the jury, the prosecutor said of this element, as to both crimes, "[In] the trunk . . . was *marijuana*. . . . [¶] . . . [¶] . . . [*That's*] *not in dispute* . . . ." Defense counsel did not object to this. In fact, during his argument to the jury, defense counsel said when defendant was stopped and arrested "the *marijuana* was found . . . . [¶] . . . [¶] . . . [The police said, 'W]e got the *marijuana*, we have cash, and we have text messages.[,'] [¶] . . . [¶] The only one that had the possession of the *marijuana* was [defendant], who's clearly a member of the

---

[22] As to the references by the witnesses, see the prior paragraph.

[23] See Judicial Council of California Criminal Jury Instructions, CALCRIM Nos. 2352 & 2361.

27

collective. . . . [¶] . . . [¶] [T]he [prosecution] brought you no evidence as to how this *marijuana* got here. [¶] . . . [Y]ou . . . had evidence of people getting on the stand and saying[,'T]hat *marijuana* in the trunk, yes, part of that was mine.['] [¶] A couple [members of the collective] actually said, ['Y]es, the *marijuana* in that trunk was partially mine.[']" As does happen in the confusion of trial, the parties, apparently, neglected to reveal to the jury that they had entered a stipulation that the substance found in the trunk was marijuana. However, by the time the jury was called upon to determine, according to the instructions given, that what was in the trunk was, in fact, marijuana, that finding had been made a foregone conclusion by the actions of both counsel, in particular, *defense counsel*. Moreover, defendant's one and only defense, i.e., that he had the marijuana for a legitimate collective, *required* him to concede that what was in the trunk was marijuana.[24] For defendant to here seriously press his contention that insufficient evidence supports such a finding is not only unmeritorious, as we have already concluded, but it invites this court to join in gamesmanship of which we will have no part. A trial is a search for the truth, not a game of "gotcha."

     b. *Sufficient Evidence that Defendant's Activities Were Contrary to the Medical Marijuana Laws*

     Defendant first asserts that there was no evidence that he sold marijuana to people that did not have medical marijuana cards or recommendations. However, this is not a

---

[24] Since defendant on appeal strenuously argues that he could not and did not advance alternative defenses, we will not interfere with his tactical decision by claiming he could also have relied on his statements that the marijuana belonged to his nephew as an alternative defense.

28

sine qua non for his conviction of transporting and possessing the marijuana for sale if other conditions were met. As the People correctly note, defendant relied on the defense that he and those who obtained marijuana from him were part of a collective engaged in the cultivation of marijuana and there was almost no evidence to support it.

Next, defendant attacks the testimony of the prosecution's expert. He asserts that his testimony about how people in lawful collectives behave was entitled to no weight. However, we do not reweigh the jury's implied finding as to the credibility of a witness's testimony. (*People v. Jones* (1990) 51 Cal.3d. 294, 314.)

Next, defendant asserts that regardless of whether he was a member of a collective, he was entitled to sell medical marijuana to medical marijuana patients. He relies on section 11362.768, which became effective January 1, 2011. It applies to a qualified patient or a person with identification cards who transports or processes marijuana for his or her own personal use, a designated primary caregiver who transports, processes, administers, delivers or gives away marijuana for medical purposes to the qualified patient of the caregiver or to the person with an identification card who has designated that person as his or her primary caregiver, any person who provides assistance to a qualified patient or card holder or that person's primary caregiver in administering medical marijuana to the patient or card holder or a primary caregiver who receives compensation for actual expenses or for payment of out-of-pocket expenses in providing services to a qualified patient or card holder. (§§ 11362.768, subd. (a); 11362.765, subd. (b).) It provides that "[n]o medical marijuana cooperative, collective, dispensary, operator, establishment, or provider who possesses, cultivates, or distributes

29

medical marijuana pursuant to this article shall be located within a 600-foot radius of a school." (§ 11362.768, subd. (b).) It applies only to cooperatives, collectives, dispensaries, operators, establishments or providers that are authorized by law to possess, cultivate or distribute medical marijuana and that have a storefront or mobile retail outlet which ordinarily requires a local business license. (§ 11362.768, subd. (e).) Based on the statute's reference to "operators" or "establishments," defendant asserts that "it does not matter if [his] dominant role in the group meant that he was not operating as part of a collective." However, it is clear to us that section 11362.768's use of the words "operator" and "establishment," along with the entities named therein, was intended to bring every type of operation that has a storefront or mobile retail outlet which ordinarily requires a local business license within the ambit of its prohibition against operating such a business near a school. We do not read it as contradicting the very clear provisions of the MMPA that the only person who can distribute marijuana to a qualified patient or card holder is their designated primary caregiver. Moreover, there was no evidence that defendant had a storefront or mobile retail outlet which ordinarily requires a local business license. Defendant's attack on that provision of the instruction on the collective defense, i.e., "A single person who calls himself a collective but merely supplies patients with marijuana has no defense under the law" is equally unfounded. It is based, in part, on the holding in *People v. Mentch* (2008) 45 Cal.4th 274, 277, 278, that one whose caregiving consists "principally of supplying marijuana and instructing on its use, and

who otherwise only sporadically took some patients to medical appointments" is not a primary caregiver under the act." Of course, we are bound by *Mentch*[25] and we detect nothing in section 11362.768 which even inferentially contradicts it. The other portion of the provision, which is actually related to defendant's argument about section 11362.768, is its reference to a "single person." However, that is just common sense—a single person cannot be considered a collective. Moreover, other provisions of the instruction quite logically referred to the collective as a group of individuals.[26]

Finally, in advancing his argument, defendant ignores the context of this case—a context, he, himself, made the tactical decision to create, i.e. that he was not guilty of either offense because he was operating a legal collective. If he wanted to make the argument that he was an operator under section 11362.768, and was not part of a collective, he should have done so, but he did not. Even if he had, he would not have been entitled to a defense unless he was a designated caregiver to everyone he supplied with marijuana, and he was unable to do this at trial.

---

[25] We are also bound by section 11362.7, subdivision (d)'s provision that a primary caregiver must "consistently assume . . . responsibility for the housing, health, or safety" of the medical marijuana patient.

[26] As part of his attack on the instructions given, defendant contends that he was entitled to an instruction that "[w]hile a single person may not be a collective, a collective need not spring up organically as the product of the simultaneous dream of a group of marijuana patients. Nothing in the law prevents a collective from being organized by or dominated by a small group of people or even a single person." First, the instructions given did not require the collective to be created in such a way or to not be so dominated, and no reasonable juror would have imputed such requirements. Thus, we also reject defendant's contention that his attorney was incompetent for failing to request such an instruction.

Defendant next asserts that there was insufficient evidence that he was selling marijuana for a profit.  According to the prosecution's expert, he was, and the jury was entitled to rely on his opinion.  Defendant's arguments in this regard would have been best left to the jury.

As part of his insufficiency of the evidence argument, defendant asserts that to the extent that the Medical Marijuana Program Act (MMPA) may be interpreted to bar cash sales of marijuana, bar the making of profit or bar the payment of reasonable wages for services performed, it is an unconstitutional amendment of the CUA because, he asserts, these things substantially restrict the ability of qualified patients to obtain medical marijuana.  First, defendant points to nothing that bars cash being given in exchange for marijuana under the MMPA.[27]  Next, the MMPA clearly bars the making of profit by any individual or collective (*Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 746), but defendant fails to persuade us that this, in any way, substantially restricts the ability of patients to obtain medical marijuana.  Finally, as we have already discussed, the MMPA allows caregivers to receive compensation for actual expenses, including reasonable compensation for services provided, and payment for out-of-pocket expenses.  (§ 11362.765, subd. (c).)

4. *Jury Instruction*

The following instruction was given on defendant's collective defense,

---

[27]  As Division One of this court pointed out in *People v. Jackson* (2012) 210 Cal.App.4th 525, " . . . [T]he Attorney General's own guidelines . . . appear to contemplate that . . . there will be an exchange of cash consideration." (*Id*. at p. 537.)

"The Prosecution has the burden of proving to you beyond a reasonable doubt that the defendant was not operating a collective. [¶] A Medical Marijuana Collective is a group composed of medical marijuana patients or their primary caregivers who collectively cultivate marijuana solely for the medical benefit of the members of the collective. [¶] A Medical Marijuana Collective must be jointly owned and operated by the members of the collective. [¶] A Medical Marijuana Collective cannot make any profit from its marijuana cultivation. [¶] The cultivation of the Collective's marijuana must be done by contributing members of the collective. [¶] A collective cannot obtain its marijuana from anyone who is not a member of the collective. [¶] Contributing members of a collective may only distribute marijuana to other contributing members of the collective. [¶] A Medical Marijuana Collective should track and record the source of the collective's marijuana. [¶] A Medical Marijuana Collective should document the labor, resources and money contributed by each member. [¶] Reimbursement by members of the collective can only be to cover actual costs and operating expenses. [¶] A single person who calls himself a collective but merely supplies patients with marijuana has no defense under the law."

Defendant here asserts that he was "entitled to an instruction that as a medical marijuana patient, he was entitled to make cash sales of medical marijuana to other medical marijuana patients, but not to non-patients." First, nothing in the instructions given prohibited defendant from getting cash in exchange for marijuana and the prosecutor never argued that defendant was guilty of either offense because he received

33

cash, which was prohibited by the law.[28]  Second, there was no evidence and defendant did not advance the defense that he, himself, was a medical marijuana patient.[29]  Finally, even if this instruction had been given, we are convinced beyond a reasonable doubt that the absence of it did not contribute to the verdicts.  (*People v. Aranda* (2012) 55 Cal.4th 342, 367.)  As we have already stated, defendant voluntarily took upon himself the defense of being part of a collective.  This required enough evidence that he was a designated primary caregiver to the people to whom he gave marijuana and that he and they were part of a collective that cultivated marijuana to create a reasonable doubt that he was guilty of both charged offenses.  There was no such evidence.  Therefore, we also reject defendant's contention that his trial attorney was incompetent for not requesting this instruction.

As for defendant's contention that the jury should have been instructed on the difference between making a profit and operating a business for profit, we have already concluded that the MMPA is quite clear in its prohibition on making a profit,[30] that

---

**28**  The prosecutor argued that the fact that defendant received cash instead of *checks* suggested that he was more like a street dealer than a legitimate member of collective, in the same way as the text messages, where defendant met the people to whom he gave marijuana and other facts suggested the same.  In *Hochanadel*, *supra*, 176 Cal.App.4th at pages 997, 1018, the appellate court cited, inter alia, the fact that an asserted collective was a cash-only enterprise as an indicator that it was not a nonprofit.

**29**  Only one witness testified that defendant had a medical marijuana card that was not a primary caregiver's card.  However, defendant never asserted that the marijuana in the trunk was just for him—such an argument would have been absurd.

**30**  Defendant's discussion of the difference between the two is in the context of cooperatives, which is not relevant to this trial.

concept is completely understandable by reasonable jurors, and no further elaboration of

the subject was required.**31**

---

**31** Before oral argument, defendant submitted a supplemental letter brief in which he called our attention to two cases which he asserted were relevant to a number of the issues he raised in his briefs. They are not. The first case is *People ex rel. City of Dana Point v. Holistic Health* (2013) 213 Cal.App.4th 1016 (*Dana Point*), in which Division Three reversed the granting of a summary judgment motion by the city, who sued Holistic Health [hereinafter, "Holistic"], a medical marijuana collective, for nuisance abatement and illegal business practices, on the basis that Holistic made a profit from distributing medical marijuana, as outlawed by the Compassion Use Act (CUA) and the Medical Marijuana Program Act (MMPA). (*Id*. at p. 1020.) Division Three concluded that summary judgment should not have been granted because there remained a disputed issue of triable fact whether Holistic made a profit or was organized and operated as a nonprofit mutual benefit corporation. (*Ibid*.) The evidence the appellate court looked at in concluding that there was a triable issue of fact was: 1) Holistic's California charities and nonprofits tax return, which reported a loss of $35,000 for that year; 2) Holistic's two financial statements, confirming a negative net income one year and a greater loss the next year, 3) the deposition of Holistic's president in which he denied that he received loans or other compensation, and, in fact, that he lent $100,000 of his own money to Holistic and had not been repaid, and he denied that Holistic operated for the profit of its shareholders and asserted that it receives compensation only for the cost of doing business, 4) Holistic's articles of incorporation, which identified it as a nonprofit mutual benefit corporation, whose purpose was the same as provided for in the CUA, 5) Holistic's written member terms and conditions, which showed that member contributions were aimed at sustaining the collective, not to earn a profit. (*Id.* at pp. 1027-1028.) In contrast, as already stated, there was *no* evidence in this case that whatever organization defendant suggested he was operating had any of these features, except for the unsupported assumptions of two of the defense witnesses, based on no evidence whatsoever, that it was nonprofit. There is nothing in this aspect of *Dana Point* that supports any of the arguments defendant advances in his briefs.

*Dana Point* otherwise observed, although not pertinent to the holding therein because the last below-mentioned feature arguably did not relate to the supplying of marijuana to Holistic (*id*. at p. 1033), that all agricultural and consumer cooperatives must organize and operate as nonprofit entities, but "they may make 'patronage distributions' in amounts corresponding to each member's 'patronage of the corporation' through the purchase of goods or services [citation], repay or refund member contributions [citation], and even pay 'dividends' thereon, as a form of interest on capital, without jeopardizing their nonprofit status [citations]. Valid nonprofit expenditures expressly include . . . 'a fair remuneration . . . ' for 'time . . . actually spent . . . in its

*[footnote continued on next page]*

*[footnote continued from previous page]*
service . . . .' [Citation.]" (*Id*. at pp. 1020-1021.) Again, there is nothing in these features of a cooperative that supports any of defendant's arguments because there was no evidence that any of these features existed in this case. As already stated, section 11362.765, subdivision (c) expressly allows a primary caregiver to receive compensation for actual expenses, including reasonable compensation incurred for services provided to enable the patient or card holder to use marijuana and for out-of-pocket expenses in providing those services. The testimony of the prosecution's expert provided sufficient evidence to support the jury's conclusion that defendant was selling marijuana for a profit, i.e., that he was receiving more than reasonable compensation for his services and out-of-pocket expenses.

The second case is *People v. Jackson* (2012) 210 Cal.App.4th 525, in which Division One of this court overturned the defendant's convictions for selling marijuana and possessing it for sale. (*Id*. at p. 529.) The trial court prohibited defendant from introducing evidence to support a collective defense solely because the nonprofit collective of MMPA qualified patients at issue had only six marijuana cultivators, but 1,600 other members who were supplied marijuana by the six. (*Ibid*.) The trial court reasoned that because of this, defendant could not establish that the collective was operated for the purpose of collectively cultivating marijuana, rather than just distributing marijuana. (*Ibid*.) Division One noted that defendant's burden was "not very great[—] only . . . to produce evidence which would create a reasonable doubt as to whether the [collective] defense . . . had been established. . . . As we interpret the MMPA, the collective or cooperative association . . . need not include active participation by all members in the cultivation process but may be limited to financial support by way of marijuana purchases from the organization. Thus, contrary to the trial court's ruling, the large membership of [the] collective, very few of whom participated in the actual cultivation process, did not, as a matter of law, prevent [defendant] from presenting a [collective] defense." (*Id* at pp. 529-530.)

The appellate court went on to note that in determining whether the collective defense has been established, a jury must determine whether it is for profit or nonprofit and the fact that there are a small number of cultivators and a large number of consumers could, along with evidence of, inter alia, "the members' participation in the operation and governance of the collective," lead to a reasonable inference that it was the former. (*Id*. at p. 530.) There is nothing in any language used in *Jackson* that assists defendant in any of his arguments except as noted in footnote 28 of this opinion. (See fn. 27, *ante*, p. 32.)

36

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

KING
J.