[No. B227958. Second Dist., Div. Three. Feb. 23, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM FRANK COLVIN, Defendant and Appellant.

Counsel

Law Offices of Lawrence S. Strauss and Lawrence S. Strauss for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Michael R. Johnsen and Eric E. Reynolds, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**ALDRICH, J.—**

## INTRODUCTION

While transporting in his car about one pound of marijuana from one medical marijuana establishment to a second, defendant and appellant William Frank Colvin was stopped and arrested. He was charged with, among other things, transporting marijuana. At his court trial, Colvin raised a defense under the Medical Marijuana Program Act (MMPA), which provides a defense to specified classes of people, including "qualified patients," who "associate . . . in order collectively or cooperatively to cultivate marijuana for medical purposes." (Health & Saf. Code, § 11362.775.)[1] The trial court found that Colvin, although a qualified patient operating a "legitimate dispensary," was not entitled to the defense because the "transportation had nothing to do with the cultivation process" and was "outside what the law permits." We conclude that, based on the trial court's findings, section 11362.775 applied. We reject the Attorney General's argument that the section applies only to those cooperatives involving "some united action or participation among all" members. The judgment is therefore reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

*I. Factual background.*

Colvin co-owns and operates Hollywood Holistic 1 and Hollywood Holistic 2 (collectively Holistic), medical marijuana dispensaries. Holistic is a nonprofit corporation, formed in 2005, opened in 2006, and registered with the City of Los Angeles in 2007. The city renewed the license in May 2010. The Los Angeles Police Department Gangs and Narcotics Division informed

---

[1] All undesignated statutory references are to the Health and Safety Code.

Colvin that Hollywood Holistic Inc.'s live scan application met the standard in the "Medical Marijuana Collective Ordinance" and would be forwarded to the office of the city clerk for the next step in the ordinance registration process. Holistic pays Colvin approximately $400 per week.[2] The money Holistic makes is used to pay rent, utilities, lights, and necessities for the business.

As of March 2009, Holistic had 1,500 patients or members, although that number grew to over 5,000 by the time of trial. Approximately 14 members, including Colvin, grow marijuana, and Holistic reimburses growers for expenditures, such as fertilizer, hydroponic equipment, and lighting for indoor growing.[3] Some growers are in Los Angeles County, but others are in Humboldt County. Those who grow marijuana drop it off at Holistic for other members to buy. Holistic also grows marijuana onsite, and the Los Angeles Police Department (LAPD) visited the three "grow rooms." None of the marijuana Holistic distributes is from a source other than a collective member.

If a person comes in with a prescription for medical marijuana, he or she is first left in "primary holding" while someone looks him or her up online or calls his or her doctor to make sure he or she is "legal." The person's identification is checked. Once that process is completed, the person is let in and fills out a membership application and patient information sheet.[4] The person is then given a prescription number that Holistic uses to identify him or her and to track when his or her prescription expires. He or she also signs a registry so that Holistic has a record of his or her medical problem. Finally, the person is given his or her medicine, which is "legally tagged" and put in a stapled bag. Every time the person returns, the visit is registered in a computer program. Patients are allowed no more than one ounce of marijuana in one day, and, to minimize the chance of crime, each Holistic establishment has no more than two to three pounds of marijuana at any time. People who come to Holistic for the first time might pay for the marijuana, but returning members pay a "charter fee," determined each quarter based on the person's needs, that is used to grow marijuana for the person.

---

[2] It is unclear whether Colvin is paid $400 total per week or $400 per week from each of the two Holistic establishments.

[3] Many individuals also grow marijuana for themselves at home.

[4] The patient declares that: " 'I am a qualified patient under California Health and Safety Code section[] 11362.5, 11362.7 et seq., and my doctor has recommended, prescribed and approved my use of medical marijuana. As per California Health and Safety Code section 11362.51, I am legally able to use, possess and cultivate cannabis for medical purposes. I understand that I am allowed to do so through safe and affordable access such as the type provided by Hollywood Holistic. I therefore designate Hollywood Holistic as my care provider for this purpose. In doing so, I agree to sign and follow all Hollywood Holistic rules and regulations regarding their services.' "

On March 10, 2009, Colvin was arrested a block and a half from Holistic 2 (in Hollywood), while he was en route to Holistic 1 (in Santa Monica). He was delivering just over a pound of marijuana for Holistic's use.[5] Colvin also had $4,285 in cash. Colvin explained to the officer that he managed marijuana dispensaries and was delivering marijuana to one of them. He had a valid doctor's note, having been prescribed marijuana since 2003.

II. *Procedural background.*

An information alleged three counts against Colvin: count 1, possession of a controlled substance, cocaine (§ 11350, subd. (a)); count 2, sale or transportation of marijuana (§ 11360, subd. (a)); and count 3, possession of concentrated cannabis (§ 11357, subd. (a)). Colvin waived his right to a jury, and, at the close of evidence, made a motion for a judgment of acquittal under Penal Code section 1118.[6] The court denied the motion and found that defendant was not entitled to the defense under section 11362.775 because "the transportation here had nothing to do with the cultivation process." The court, however, also found that Colvin was a qualified patient and that Colvin was operating a "legitimate" "dispensary." The court rejected Colvin's due process argument.

On September 9, 2010, the trial court placed Colvin on probation under Proposition 36 for 18 months on count 1 for possession of cocaine. The court also placed him on three years' probation on counts 2 and 3 and ordered him to perform 200 hours of community service.

## DISCUSSION

*Section 11362.775 applied to Colvin based on the trial court's express findings.*

██ In 1996, voters passed Proposition 215, the Compassionate Use Act of 1996 (CUA; § 11362.5). One purpose of the CUA was to "ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been

---

[5] Colvin also had Vicodin pills and cocaine. Colvin was not charged with any crime relating to the Vicodin, and he does not challenge on appeal his sentence on count 1, relating to his cocaine possession.

[6] "In a case tried by the court without a jury, . . . the court on motion of the defendant or on its own motion shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading after the evidence of the prosecution has been closed if the court, upon weighing the evidence then before it, finds the defendant not guilty of such offense or offenses. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right." (Pen. Code, § 1118.)

recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment" of illnesses for which marijuana provides relief. (§ 11362.5, subd. (b)(1)(A); see also *People v. Wright* (2006) 40 Cal.4th 81, 89–90 [51 Cal.Rptr.3d 80, 146 P.3d 531].) A second purpose was to ensure that patients and their primary caregivers who obtain and use medical marijuana are not subject to criminal prosecution or sanction. (§ 11362.5, subd. (b)(1)(B).) The CUA therefore provided that section 11357, relating to the possession of marijuana, and section 11358, relating to the cultivation of marijuana, "shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient" upon a doctor's recommendation. (§ 11362.5, subd. (d).) The CUA thus provided a limited immunity from prosecution, including a defense at trial. (*People v. Mower* (2002) 28 Cal.4th 457, 470 [122 Cal.Rptr.2d 326, 49 P.3d 1067].)

 In response to the CUA's encouragement "to implement a plan to provide for the safe and affordable distribution of marijuana to all patients" in need of it (§ 11362.5, subd. (b)(1)(C)), our Legislature enacted the MMPA (§ 11362.7 et seq.). Through the MMPA, the Legislature sought to "(1) [c]larify the scope of the application of the act and facilitate the prompt identification of qualified patients and their designated primary caregivers in order to avoid unnecessary arrest and prosecution of these individuals and provide needed guidance to law enforcement officers. [¶] (2) Promote uniform and consistent application of the act among the counties within the state. [¶] (3) Enhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects." (Stats. 2003, ch. 875, § 1, subd. (b), pp. 6422–6423.) To these ends, section 11362.775 of the MMPA provides, "Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, *who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes*, shall not solely on the basis of that fact be subject to state criminal sanctions under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570." (§ 11362.775, italics added.)[7]

---

[7] The Legislature also enacted section 11362.765, which provides:

"(a) Subject to the requirements of this article, the individuals specified in subdivision (b) shall not be subject, on that sole basis, to criminal liability under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570. However, nothing in this section shall authorize the individual to smoke or otherwise consume marijuana unless otherwise authorized by this article, nor shall anything in this section authorize any individual or group to cultivate or distribute marijuana for profit.

"(b) Subdivision (a) shall apply to all of the following:

"(1) A qualified patient or a person with an identification card who transports or processes marijuana for his or her own personal medical use.

■ The trial court here concluded that section 11362.775 did not apply to Colvin because "the transportation . . . had nothing to do with the cultivation process." The trial court's conclusion, however, does not flow from its findings. The court found that Colvin was a qualified patient and that he was operating a "legitimate" "dispensary."[8] If Colvin, a qualified patient, was operating a legitimate medical marijuana cooperative, then he "shall not solely on the basis of that fact be subject to state criminal sanctions under" section 11360 (transportation or sale of marijuana). (§ 11362.775; see generally *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 785 [33 Cal.Rptr.3d 859] (*Urziceanu*) [finding that § 11362.775 represents "a dramatic change in the prohibitions on the use, distribution, and cultivation of marijuana for persons who are qualified patients or primary caregivers . . . . Its specific itemization of the marijuana sales law indicates it contemplates the formation and operation of medicinal marijuana cooperatives that would receive reimbursement for marijuana and the services provided in conjunction with the provision of that marijuana."].) The court nonetheless held that the defense did not apply to Colvin because "his transportation was outside of what the law permits."

---

"(2) A designated primary caregiver who transports, processes, administers, delivers, or gives away marijuana for medical purposes, in amounts not exceeding those established in subdivision (a) of Section 11362.77, only to the qualified patient of the primary caregiver, or to the person with an identification card who has designated the individual as a primary caregiver.

"(3) Any individual who provides assistance to a qualified patient or a person with an identification card, or his or her designated primary caregiver, in administering medical marijuana to the qualified patient or person or acquiring the skills necessary to cultivate or administer marijuana for medical purposes to the qualified patient or person.

"(c) A primary caregiver who receives compensation for actual expenses, including reasonable compensation incurred for services provided to an eligible qualified patient or person with an identification card to enable that person to use marijuana under this article, or for payment for out-of-pocket expenses incurred in providing those services, or both, shall not, on the sole basis of that fact, be subject to prosecution or punishment under Section 11359 or 11360."

Colvin does not raise this section as a defense and does not discuss it. Rather, he conceded in the trial court and in this court that he was not transporting the marijuana for his personal use, and he was not a primary caregiver. (See generally § 11362.5, subd. (e) [a primary caregiver is an individual designated by the person exempted under the CUA who has consistently assumed responsibility for the housing, health, or safety of that person]; *People v. Mentch* (2008) 45 Cal.4th 274, 283 [85 Cal.Rptr.3d 480, 195 P.3d 1061] [a primary caregiver is a person who (1) consistently provides caregiving (2) independent of any assistance in taking medical marijuana, (3) at or before the time he or she assumed responsibility for assisting with medical marijuana].)

[8] It is not clear the trial court was using the word "dispensary" in anything but a general, colloquial sense, rather than a formal legal one. We refer broadly to cooperatives, collectives, and dispensaries without distinguishing between technical differences that may exist between them.

It is unclear what the trial court meant when it said that Colvin's transportation of marijuana was unrelated to the cultivation process and was outside what section 11362.775 allows. There was no evidence that Colvin's transportation of one pound of marijuana was for anything other than Holistic. To the extent the trial court ruled as it did because it believed that only cooperative or collective *cultivators* of marijuana can transport the product, Colvin/Holistic is a cultivator: Holistic has three onsite "grow rooms," which the LAPD visited. Fourteen members of Holistic also grow marijuana for Holistic offsite. All of the marijuana Holistic distributes is from a cooperative member; none of it is acquired from an outside source. Thus, even under a reading of section 11362.775 limiting transportation of marijuana only to cooperatives that cultivate it, then Colvin was entitled to the immunity.

The Attorney General's only response is that section 11362.775 does not condone "a large-scale, wholesale-retail marijuana network" like Holistic, which has approximately 5,000 members. The Attorney General argues that a collective or cooperative cultivation "must entail some united action or participation among all those involved, as distinct from merely a supplier-consumer relationship." There must be, the Attorney General suggests, "some modicum of collaboration" in which qualified patients and caregivers " 'come together' " in "some way."

■ Nothing on the face of the statute or in its legislative history supports this interpretation. When interpreting a statute, our " 'fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.' " (*People v. Lewis* (2008) 43 Cal.4th 415, 491 [75 Cal.Rptr.3d 588, 181 P.3d 947].) " 'We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.]' " (*Id.* at p. 491.) If the statutory language is unambiguous, the plain meaning controls. (*People v. King* (2006) 38 Cal.4th 617, 622 [42 Cal.Rptr.3d 743, 133 P.3d 636].) But if the statutory language is reasonably susceptible to more than one interpretation, we may consider various extrinsic aids, including " ' " 'the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute.' " ' [Citations.]" (*Ibid.*; see also *In re Derrick B.* (2006) 39 Cal.4th 535, 539 [47 Cal.Rptr.3d 13, 139 P.3d 485].)

■ On the face of the statute, to be entitled to a defense under section 11362.775, a defendant must, first, be either a qualified patient, person with a valid identification card or a designated primary caregiver. Second, the defendant must associate with like persons to collectively or cooperatively cultivate marijuana. (§ 11362.775.) There is no dispute as to the first requirement, namely, that Colvin was a qualified patient. The trial court made a finding he was a qualified patient, and the Attorney General does not

challenge that finding. There does not even appear to be a dispute that Holistic is comprised of other qualified patients, persons with valid identification cards or designated primary caregivers. That Holistic is comprised of persons designated in section 11362.775 was impliedly found by the trial court when it said Holistic was a "legitimate" dispensary.

The dispute concerns what it means to "collectively or cooperatively" cultivate medical marijuana. The MMPA's legislative history tells us little about section 11362.775 or what it means to associate to "collectively or cooperatively . . . cultivate [medical] marijuana." It merely reveals that an initial version of the section would have directed the Department of Health Services to promulgate regulations ensuring the consistency and quality of medicinal marijuana and protect against its illegal diversion, and that some groups were concerned it would lead to "mafia-like" organizations of marijuana growers. (See, e.g., Lopez, Traditional Values Coalition, Mem. to Assem. Com. on Pub. Safety Chair Mark Leno & Vice Chair Jay La Suer, June 27, 2003.)

But, in general, cooperatives are organizations that provide services for use primarily by their members. (Gurnick, *Consumer Cooperatives: What They Are and How They Work* (July/Aug. 1985) L.A. Lawyer, p. 23.) "Entities such as production, service, purchasing, and marketing cooperatives engage on a cooperative basis in producing or procuring goods, services or supplies for members and patrons and promoting use of their members' products and services." (*Ibid.*) Cooperatives perform functions its individual members could not do alone as effectively and conduct business for the mutual benefit of members.[9] (*Gurnick*, at pp. 23, 24.)

The evidence here was Holistic obtained its business licenses, was a nonprofit corporation, and was in the process of complying with then applicable ordinances. The trial court thus found that Holistic was a "legitimate" dispensary, which implies that the court believed Holistic was complying with the appropriate laws.

---

[9] Under California law, agricultural cooperatives consist of three or more natural persons who are engaged in the production of horticultural and related products (Food & Agr. Code, § 54004), and who "form an association pursuant to this chapter for the purpose of engaging in" agriculture-related activities (Food & Agr. Code, § 54061). Consumer cooperatives consist of members who associate and form a corporation "for any lawful purpose provided that it shall be organized and shall conduct its business primarily for the mutual benefit of its members as patrons of the corporation." (Corp. Code, § 12201.)

The Attorney General does not argue otherwise, instead maintaining that a medical marijuana cooperative seeking the protections of section 11362.775 must establish that some number of its members participate in the process in some way. The Attorney General does not specify *how* many members must participate or in *what* way or ways they must do so, except to imply that Holistic, with its 5,000 members and 14 growers, is simply too big to allow any "meaningful" participation in the cooperative process; hence, it cannot be a "cooperative" or a "collective" in the way section 11362.775 intended. But this interpretation of section 11362.775 would impose on medical marijuana cooperatives requirements not imposed on other cooperatives. A grocery cooperative, for example, may have members who grow and sell the food and run a store out of which the cooperative's products are sold. But not everyone who pays a fee to become a member participates in the cooperative other than to shop at it.

In fact, Holistic is similar to FloraCare, the cooperative in *Urziceanu, supra*, 132 Cal.App.4th 747. The defendant, a qualified patient, ran FloraCare from a house, which was also a marijuana grow site. (*Id.* at p. 764.) As a condition to membership in FloraCare, a person had to complete a membership application, pay a $25 membership fee, and produce a valid California driver's license or other identification and a physician's recommendation. (*Id.* at pp. 760, 763.) FloraCare verified the information with the physician unless the member had a card from another "club." (*Id.* at p. 764.) The cooperative had "a few hundred" members, at least a dozen of whom helped to grow the marijuana. Upwards of 15 members processed new members and assisted with administrative duties. (*Id.* at p. 764.)[10] Because FloraCare had an insufficient supply of marijuana, the defendant sometimes bought it on the black market to supply members. (*Ibid.*) Marijuana was given away for free, although some marijuana products had a suggested donation value. (*Id.* at pp. 764, 767.) FloraCare members also testified, among other things, that they were qualified patients who obtained marijuana from FloraCare for personal medical use; that they believed they belonged to a cooperative; and that they owned a number of the plants FloraCare grew. Based on this evidence, *Urziceanu* found that the jury should have been instructed on a defense under the MMPA.

Although the Attorney General argues that the facts in *Urziceanu* more strongly support a defense under section 11362.775 than the facts here, the facts are not so dissimilar that we can say one case is stronger than the other. Like FloraCare, Holistic required potential members to produce a valid doctor's recommendation or prescription and identification. Like FloraCare, applicants for membership in Holistic had to fill out an application and pay a

---

[10] It is unclear whether all or some of the members who grew marijuana were the same members who assisted with administrative duties.

membership fee. True, FloraCare was a smaller operation with "a few hundred" members, as opposed to Holistic's 5,000 members. And some FloraCare members assisted in the growing process, while Colvin did not testify to what extent Holistic members helped with the cultivation process, other than the 14 members who cultivated marijuana. But section 11362.775 does not, on its face, permit the former and disallow the latter based on the cooperative's size and the extent to which members participate in it.

Moreover, an important distinguishing fact between FloraCare and Holistic is that FloraCare relied on black market sources to fill supply gaps whereas all marijuana distributed to Holistic members is grown by its members. Such a "closed system" not only more closely models the traditional notion of a cooperative, but it also complies with the California Attorney General's Guidelines for the Security and Non-diversion of Marijuana Grown for Medical Use (Aug. 2008) (<http://ag.ca.gov/cms_attachments/press/pdfs/n1601_medicalmarijuanaguidelines.pdf> [as of Feb. 23, 2012]) (hereafter *Guidelines*).[11] Those *Guidelines* advise cooperatives not to buy marijuana from or sell to nonmembers, and cooperatives "should only provide a means for facilitating or coordinating transactions between members." (*Guidelines*, § IV.A.1, 2, p. 8.) "Nothing allows marijuana to be purchased from outside the collective or cooperative for distribution to its members. Instead, the cycle should be a closed-circuit of marijuana cultivation and consumption with no purchases or sales to or from non-members." (*Id.*, § IV.B.4, p. 10.)

Holistic complied with other guidelines. Holistic, for example, is a nonprofit registered with the City of Los Angeles in 2007, and Colvin took steps to comply with applicable ordinances (*Guidelines, supra*, § IV.A.1, 2, B.1, 2, pp. 8, 9 [advising cooperatives to incorporate under the Corp. Code or Food & Agr. Code and to obtain applicable business licenses and permits]); Holistic requires members to fill out membership forms, assigns each member a number to track prescription expiration, and keeps a record of members' medical problems and each time a member returns (*id.*, § IV.B.3, p. 9 [potential members should complete a written membership application, their status should be verified, membership records should be maintained, and expiration of prescriptions should be tracked]); all money Holistic receives from members goes back into the cooperative (*id.*, § IV.B.5, p. 10 ["[a]ny

---

[11] Those guidelines are entitled to considerable weight but do not bind us. (*People v. Hochanadel* (2009) 176 Cal.App.4th 997, 1011 [98 Cal.Rptr.3d 347].)

Section 11362.81, subdivision (d), of the MMPA, directs the Attorney General to develop and adopt appropriate guidelines to ensure the security and nondiversion of marijuana grown for medical use by patients qualified under the CUA.

monetary reimbursement that members provide to the collective or cooperative should only be an amount necessary to cover overhead costs and operating expenses"]); Holistic bases membership fees on the cost to cover the member's needs (*id.*, § IV.B.6, p. 10 [marijuana may be allocated based on fees that are reasonably calculated to cover overhead costs and operating expenses]); Colvin was transporting only one pound of marijuana (*id.*, § IV.B.7, p. 10 ["collectives and cooperatives may cultivate and transport marijuana in aggregate amounts tied to its membership numbers"]); and Holistic employs security measures, namely, it keeps new applicants in a "primary holding" area and verifies their information before admitting them and has no more than two to three pounds of marijuana on the premises at any given time (*id.*, § IV.B.8, p. 11 [collectives and cooperatives should take security measures to protect patients and surrounding neighborhoods]). Thus, to the extent these guidelines have any weight, they contemplate cooperatives like Holistic.

■ Taken to its logical conclusion, an effect of imposing the Attorney General's suggested requirement likely would be to limit drastically the size of medical marijuana establishments. It may be that the Legislature, in trying to implement voters' wishes, envisioned small community or neighborhood marijuana gardens. That may be good policy. But nothing on the face of section 11362.775, or in the inherent nature of a cooperative or collective, requires some unspecified number of members to engage in unspecified "united action or participation" to qualify for the protection of section 11362.775. If such a requirement is what the Legislature intended, then it can say so; but the Attorney General's vague qualifier provides little direction or guidance to, among others, qualified patients, primary caregivers, law enforcement, and trial courts. Rather, imposing the Attorney General's requirement would, it seems to us, contravene the intent of the MMPA by limiting patients' access to medical marijuana and leading to inconsistent applications of the law.

■ We therefore conclude that section 11362.775 applies to count 2, transportation of marijuana. And to the extent section 11362.775 applies to count 2 for transportation of marijuana, it also applies to count 3 for possession of concentrated cannabis,[12] and the Attorney General does not argue otherwise. (§ 11357, subd. (a).) The judgment on those counts must be reversed.[13]

---

[12] Concentrated cannabis is the "separated resin, whether crude or purified, obtained from marijuana." (§ 11006.5.)

[13] Because we conclude that section 11362.775 applies to Colvin, we do not address his alternative due process argument.

## DISPOSITION

The judgment on counts 2 and 3 is reversed.

Klein, P. J., and Kitching, J., concurred.

Respondent's petition for review by the Supreme Court was denied May 23, 2012, S200786.