Filed 9/16/13  P. v. Watrous CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046917 |
| v. | (Super. Ct. No. 09NF3431) |
| STANLEY ROBERT WATROUS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James Edward Rogan and Nicholas S. Thompson, Judges.  Affirmed.

Tom Stanley for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Donald W. Ostertag and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

The trial court placed defendant Stanley Robert Watrous on three years' formal probation after a jury found him guilty of possessing marijuana for sale (Health & Saf. Code, § 11359; all further statutory references are to this code unless otherwise indicated) and transporting marijuana (§ 11360, subd. (a)). On appeal, defendant challenges the denial of his pretrial motion to suppress evidence (Pen. Code, § 1538.5) and the trial court's failure to instruct the jury that it could find his actions were lawful under the Compassionate Use Act of 1996 (§ 11362.5; CUA) or the Medical Marijuana Program (§ 11362.7 et seq.; MMP). Finding no error, we affirm the judgment.

## DISCUSSION

1. *Defendant's Motion to Suppress Evidence*

   *a. Background*

   Deputy Sheriff Hector Romero was the sole witness at the hearing on defendant's suppression motion. Romero testified he was on duty and driving a marked patrol vehicle one evening in late November 2009 when he saw a vehicle driven by defendant with a plastic cover over the rear license plate and tinted windows. Based on these observations, Romero made a traffic stop.

   As Romero approached the car, defendant opened the driver's side door, explaining his window was not working. Romero noticed the smell of fresh marijuana and asked defendant if he had been smoking it in his vehicle. Defendant admitted he had smoked marijuana earlier. As defendant was retrieving his vehicle registration and proof of insurance documents, Romero saw his medical marijuana card. Defendant explained he suffered from glaucoma and a doctor had given him a prescription to use it.

   Romero asked defendant if he had marijuana in the vehicle and defendant admitted "he had a little bit . . . ." Romero asked to see the marijuana. According to

2

Romero, defendant "hesitated for a minute, and then he said he didn't really want to show it to me, but he would if I really was inclined to see it." Romero said he was so inclined and defendant stepped out the car and walked to the trunk area. Just before opening the trunk, defendant said he had about three pounds of marijuana.

After defendant opened the trunk, Romero saw several jars containing marijuana. Romero radioed for assistance. Subsequently, it was determined the vehicle contained 12 pounds of marijuana. Based on this discovery, the sheriff's department obtained a search warrant for defendant's motel room where additional evidence was seized.

### b. Analysis

Defendant argues the trial court erred in denying his pretrial motion to suppress evidence because the evidence "was derived from an illegal search based upon a submission to authority." Noting the prosecutor acknowledged during the suppression hearing that the basis of the search was probable cause, not consent, defendant claims Romero's smelling marijuana when he opened the car door "was without merit due to the uncontested fact that [he] was entitled to legally possess marijuana . . . ."

The trial court properly denied the motion. Romero's observation of the covered rear license plate (Veh. Code, § 5201, subd. (b)) and tinted windows (Veh. Code, § 26708, subd. (a)) justified the initial detention. "'"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." [Citation.] If there is a legitimate reason for the stop, the subjective motivation of the officers is irrelevant.' [Citations.]" (*People v. Tully* (2012) 54 Cal.4th 952, 980.; see also *Arizona v. Johnson* (2009) 555 U.S. 323, 327 [129 S.Ct. 781, 172 L.Ed.2d 694] ["in a traffic-stop setting" the requirement of "a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its

3

occupants pending inquiry into a vehicular violation" and "[t]he police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity"].)

Romero, who had both training and experience related to marijuana, testified he smelled fresh marijuana when defendant opened the driver's side door. This fact provided probable cause to expand the scope of the detention. In *People v. Cook* (1975) 13 Cal.3d 663, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22, the California Supreme Court declared police officers "could rely on a strong aroma of fresh marijuana as giving [them] "'probable cause to believe . . . that contraband may be present[]'"'" in upholding the warrantless search of a car after stopping it for speeding. (*People v. Cook, supra,* 13 Cal.3d at p. 668.)

*Cook* also imposed a requirement the search be justified by the presence of exigent circumstances. (*People v. Cook, supra,* 13 Cal.3d at p. 669.) But since the enactment of Proposition 8, we judge the propriety of a challenged search or seizure under federal law. (*People v. Schmitz* (2012) 55 Cal.4th 909, 916 ["Challenges to the admissibility of evidence obtained by a police search and seizure are reviewed under federal constitutional standards"].) Evidence of exigent circumstances is not required to justify the search of a vehicle under the Fourth Amendment's automobile exception. (*Pennsylvania v. Labron* (1996) 518 U.S. 938, 940 [116 S.Ct. 2485, 135 L.Ed.2d 1031].) "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." (*United States v. Ross* (1982) 456 U.S. 798, 825 [102 S.Ct. 2157, 72 L.Ed.2d 572].)

When Romero detained defendant, the MMP prohibited the arrest of a person who possessed or transported marijuana (§ 11362.71, subd. (e)), but limited the amount of marijuana one could possess to no more than eight ounces, absent a doctor's recommendation (§ 11362.77, subds. (a) & (b)). In *People v. Kelly* (2010) 47 Cal.4th 1008, the Supreme Court struck down this limitation, finding it "conflict[ed]

4

with . . . the CUA's guarantee that a qualified patient may possess and cultivate *any amount of marijuana reasonably necessary for his or her current medical condition*." (*Id.* at p. 1043.) But the decision in *Kelly* was issued in January 2010 and thus does not affect the validity of Romero's November 2009 search of defendant's vehicle. (*Michigan v. DeFillippo* (1979) 443 U.S. 31, 37-40 [99 S.Ct. 2627, 61 L.Ed.2d 343][search incident to arrest upheld even though based on ordinance later declared unconstitutional]; *People v. Hardacre* (2004) 116 Cal.App.4th 1292, 1300-1301 [search conducted after stop for speeding upheld even though court found stop resulted from illegal speed trap].)

Defendant's reliance on his medical marijuana card does not alter the result. *People v. Strasburg* (2007) 148 Cal.App.4th 1052 upheld the search of a defendant's car even though the defendant informed the deputy sheriff before the search that he was authorized to possess marijuana. "Under the facts and circumstances of this case, Deputy Mosely had probable cause to search defendant's car for marijuana after he smelled the odor of marijuana. [Citations.] Defendant admitted smoking marijuana, and the deputy sheriff saw another bag of marijuana in the car after defendant handed him one. Armed with the knowledge that there was marijuana in the car, 'a person of ordinary caution would conscientiously entertain a strong suspicion that even if defendant makes only personal use of the marijuana found in [the passenger area], he might stash additional quantities for future use in other parts of the vehicle, including the trunk.' [Citation.] [¶] The fact that defendant had a medical marijuana prescription, and could lawfully possess an amount of marijuana greater than that Deputy Mosely initially found, does not detract from the officer's probable cause. . . . [T]he [CUA] provides a limited immunity—not a shield from reasonable investigation. An officer with probable cause to search is not prevented from doing so by someone presenting a medical marijuana card or a marijuana prescription. Given the probable cause here, the officer is entitled to continue to search and investigate, and determine whether the subject of the investigation

5

is in fact possessing the marijuana for personal medical needs, and is adhering to the . . . limit on possession." (*Id.* at pp. 1059-1060.)

The same is true here. Romero smelled fresh marijuana when defendant opened the door. Defendant admitted recently using marijuana and that he had "a little bit" of it in the car. His display of a medical marijuana card did not bar a further search of the car.

In his opening brief, defendant refers to cases involving custodial interrogation. The reason for citing these cases is not explained. But to the extent defendant may be suggesting Romero violated his rights by asking whether he had any marijuana, it is well settled "a routine traffic stop, although a detention, is not tantamount to a formal arrest, and, therefore, questions asked during such detentions do not constitute a custodial interrogation requiring *Miranda* [*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694]] warnings. [Citation.]" (*People v. Tully, supra,* 54 Cal.4th at p. 982; see also *Berkemer v. McCarty* (1984) 468 U.S. 420, 435-440 [104 S.Ct. 3138, 82 L.Ed.2d 317].) Further, Romero testified defendant was cooperative and described their conversation as "casual, friendly." Finally, since defendant volunteered he had three pounds of marijuana in his car, a custodial interrogation claim as to this statement would lack merit in any event.

We conclude the trial court properly denied defendant's motion to suppress evidence.

2. *Defendant's Medical Marijuana Defense Claims*

   a. *Background*

Before trial began, the court considered the prosecution's Evidence Code section 402 motions seeking to bar defendant from asserting two affirmative defenses; (1) he was a qualified caregiver, and (2) participated in the operation of a legitimate medical

marijuana cooperative. Defendant presented offers of proof in support of each affirmative defense. Relying on this court's then recent decision in *City of Lake Forest v. Evergreen Holistic Collective* (2012) 203 Cal.App.4th 1413, review granted May 16, 2012, S201454, briefing deferred pursuant to rule 8.512(d)(2), California Rules of Court, the trial court granted the People's motion.

During trial, Romero testified in conformity with the testimony he gave during the suppression hearing. In addition, he stated defendant's car contained 24 jars each containing one-half pound of marijuana, plus a scale and a cigarette rolling machine. According to Romero, when asked why he had so much marijuana, defendant said he had come from up north and was going to sell the marijuana to a dispensary located near LAX.

Orange County Sheriff's Investigator Larry Zurborg testified that after arriving at the scene of the vehicle stop, defendant said he lived in Trinity County. Zurborg learned defendant was staying at a nearby motel and obtained a search warrant for his room. The search resulted in the discovery of nearly $14,000 in cash, most of it in $20 denominations, plus a couple of ounces of marijuana. Defendant also told Zurborg he was trying to sell his excess marijuana for $1,600 a pound to a cooperative near LAX. Defendant claimed to belong to a Northern California cooperative and that he was a primary caregiver to three persons, one of whom lived in Orange County. But defendant could not recall the local patient's last name or address, although he claimed he knew how to reach her residence. Defendant denied belonging to a cooperative in the Los Angeles or Orange County area.

Testifying as an expert, Zurborg stated a person who was a heavy user of marijuana would ingest about 3 grams a day. Over one year that would amount to 2.4 pounds of marijuana. Based on defendant's statements, the amount of marijuana found in his car and the way it was packaged, along with the scale and large amount of cash,

7

Zurborg opined he possessed the marijuana for sale. On cross-examination, Zurborg acknowledged members of a collective or cooperative can distribute marijuana among the members, but he did not think a person could be reimbursed for out-of-pocket expenses incurred growing marijuana for a collective. He understood compensation and reimbursement for costs was limited to expenses incurred by a primary caregiver. Zurborg agreed defendant's sale price was comparatively low, claiming marijuana from Northern California "is going for . . . [$]3,000 a pound, [$]4,000 a pound . . . ."

The defense called three witnesses. Corporal Omar Brown of the Trinity County Sheriff's Department testified defendant calls the department every year about his marijuana growing operation. Brown had served search warrants on defendant's property in 2004 and 2005 and, on each occasion, concluded the operation was in compliance with the law.

William Britt, the director of an organization named the Association of Patient Advocates, testified concerning the nature of marijuana collectives, the process of growing marijuana, the expenses involved in its cultivation, and the means used to ingest the drug. Britt estimated the typical patient who smokes marijuana uses three to six pounds a year.

According to Britt, it costs about $3,000 to produce a pound of marijuana indoors and a little over one-half that amount if it is grown outdoors. These estimates included the cost of labor which he testified ranged between $10 and $25 per hour. Excluding labor expenses, the cost of growing marijuana would range between $1,500 and $2,000 if grown indoors and between $200 and $500 if grown outdoors. Britt also claimed a grower would be entitled to reimbursement for electricity, equipment, and the portion of the mortgage or rent attributable to the growing process. He concluded the packaging of the marijuana found in defendant's car was consistent with either distribution to collectives or personal use.

8

At the defense's request, the court took judicial notice of two documents. The first, from the California Secretary of State, reflected the incorporation of an entity named All-American Health and Healing Cooperative (All-American). The second was that entity's articles of incorporation, which stated All-American was a nonprofit corporation facilitating the collective and cooperative cultivation and distribution of medical marijuana.

Defendant testified he lives in Trinity County. He has several medical conditions, including glaucoma, rheumatoid arthritis, adult-onset diabetes, and has suffered two heart attacks. Since 1994, defendant has received Social Security Disability Insurance payments. He obtained authorization to use medical marijuana from his cardiologist. In 2002, defendant began growing marijuana. Currently, he owns a one and one-half acre lot, two-thirds of which he uses to grow marijuana. Defendant claimed he joined All-American in the summer of 2009. He also testified to having a caregiver role distributing marijuana to persons with medical marijuana cards.

When arrested, defendant was attempting to deliver the 12 pounds of marijuana found in his car to All-American's Inglewood dispensary. He denied telling the deputy sheriffs he intended to sell the marijuana.

Defendant described the costs he incurred to grow marijuana; materials for building grow boxes, installing in a well on his property, gasoline to run a generator and for vehicular expenses, plus his mortgage. He claimed these expenses totaled around $18,000, not including the value of his time and effort.

On cross-examination, defendant testified the money seized from his motel room was received from a Sacramento dispensary to which he also belonged and had provided marijuana. Defendant claimed to also be a member of the Sacramento dispensary. Asked about his caregiving activities, defendant acknowledged he did not provide housing, health, or safety assistance to any medical marijuana patient, explaining

9

"[w]hen I use the word 'caretaker' what I'm saying is that I grow medical marijuana for people who can't."

Defendant explained he decided to stay at a motel while in Southern California because when he visited All-American's dispensary "they . . . told me that the amount of medical marijuana that I had was more than their limit and that I needed to come back in two days." He acknowledged the marijuana found in his car constituted his first delivery to All-American. In response to a juror's question, defendant testified he grew 44 pounds of marijuana in 2009. Other than the 12 pounds intended for the Inglewood dispensary, plus 10 pounds he distributed to the Sacramento dispensary, defendant claimed he grew "five and quarter pounds [each for himself], and three other people." No accounting was provided for the additional pound.

#### b. Analysis

Arguing he "was entitled to reasonable compensation for his costs in providing medical marijuana under the law," defendant claims the trial court erred by precluding him from presenting evidence in support of his caregiver and medical marijuana defenses and by not instructing the jury on them. We conclude the trial court did not err.

The trial court did not bar defendant from presenting evidence of his purported caregiver status or his distribution of marijuana to collectives of which he claimed to be a member. The sole question is whether the trial court erred in refusing to instruct the jury on the caregiver and medical marijuana defenses to the charges.

"'It is well settled that a defendant has a right to have the trial court . . . give a jury instruction on any affirmative defense for which the record contains substantial evidence [citation]—evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory

10

of the case [citation]. In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . ." [Citations.]' [Citations.] On appeal, we likewise ask only whether the requested instruction was supported by substantial evidence — evidence that, if believed by a rational jury, would have raised a reasonable doubt" as to defendant's guilt. (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)

As for the caregiver affirmative defense, the record clearly establishes defendant's argument lacks merit. He relies on section 11362.5. Subdivision (d) of that statute declares "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." Defendant was charged with possessing marijuana for sale (§ 11359) and transporting marijuana (§ 11360), not sections 11357 or 11358. Nor did defendant qualify as a primary caregiver. The statute defines this term as "the individual designated by the person exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person." (§ 11362.5, subd. (e).) The defense failed to present any proof that the individuals for whom defendant claimed to be a caregiver qualified as exempt persons under section 11362.5. Further, in *Mentch*, the Supreme Court held "a defendant asserting primary caregiver status must prove at a minimum that he or she (1) consistently provided caregiving, (2) independent of any assistance in taking medical marijuana, (3) at or before the time he or she assumed responsibility for assisting with medical marijuana." (*People v. Mentch, supra,* 45 Cal.4th at p. 283.) Defendant acknowledged his caregiving activities were limited to solely providing marijuana to others. This conduct alone cannot support a caregiver defense.

11

Defendant also relies on the MMP. In part, it declares "Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under Section . . . 11359 [and] 11360 . . . ." (§ 11362.775.) To justify an instruction on this affirmative defense, defendant had the burden of producing evidence sufficient to raise a reasonable doubt as to whether his activity was protected by the statute. (*People v. Solis* (2013) 217 Cal.App.4th 51, 57.) The Supreme Court has recently recognized both the CUA and the MMP provide only limited protection from criminal prosecution for marijuana-related crimes. (*City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729, 748-749.) As for the MMP, the court noted "section 11362.775[] provides only that when particular described persons engage in particular described conduct, they enjoy, with respect to that conduct, a limited immunity *from specified state marijuana laws*." (*Id.* at p. 748.)

Several cases have recently considered the scope of this limited defense. In *People v. Colvin* (2012) 203 Cal.App.4th 1029, the court held a defendant charged with transporting one pound of marijuana between two dispensaries belonging to the same cooperative was entitled to assert a defense under section 11362.775. In so ruling *Colvin*, rejected arguments that transporting marijuana was unrelated to its cultivation and the MMP defense was limited small scale operations. "[T]o be entitled to a defense under section 11362.775, a defendant must, first, be either a qualified patient, person with a valid identification card or a designated primary caregiver. Second, the defendant must associate with like persons to collectively or cooperatively cultivate marijuana. [Citation.]" (*People v. Colvin, supra,* 203 Cal.App.4th at p. 1037.) *Colvin* found the defendant constituted a qualified patient. And, based on the detailed description of the

12

cooperative, including the size of its membership, new member induction process, plus how and where it obtains the marijuana provided to members (*id.* at pp. 1032-1033), the court found the defendant belonged to a dispensary that satisfied the statutory requirements to distribute marijuana for medical purposes. "Colvin/Holistic is a cultivator . . . . All of the marijuana Holistic distributes is from a cooperative member; none of it is acquired from an outside source. Thus, even under a reading of section 11362.775 limiting transportation of marijuana only to cooperatives that cultivate it, then Colvin was entitled to the immunity." (*People v. Colvin, supra,* 203 Cal.App.4th at p. 1037.)

*People v. Jackson* (2012) 210 Cal.App.4th 525, followed *Colvin*, also rejecting a claim the defense did not apply because of the large size of the collective to which the defendant belonged. "The defense the MMPA provides to patients who participate in collectively or cooperatively cultivating marijuana requires that a defendant show that members of the collective or cooperative: (1) are qualified patients who have been prescribed marijuana for medicinal purposes, (2) collectively associate to cultivate marijuana, and (3) are not engaged in a profit-making enterprise. . . . Thus, contrary to the trial court's ruling, the large membership of Jackson's collective, very few of whom participated in the actual cultivation process, did not, as a matter of law, prevent Jackson from presenting an MMPA defense." (*Id.* at pp. 529-530.) Finally, in *People v. Solis, supra,* 217 Cal.App.4th 51, the court rejected the applicability of the defense created by section 11362.775, holding it "does not apply . . . if the operation does not meet the definition of a 'collective or cooperative' and marijuana has been sold for a profit." (*Id.* at p. 53.)

Thus, to support an instruction on the MMP as an affirmative defense, defendant had to present evidence that: (1) He was either a medical marijuana patient, holder of an identification card authorizing his use of medical marijuana, or the primary

13

caregiver of such a patient or card holder; (2) associated with others to collectively or cooperatively cultivate medical marijuana; and (3) the collective or cooperative itself satisfies the statutory requirements for cultivating and distributing medical marijuana. Defendant testified he was a medical marijuana patient and established he possessed an identification card.  But the evidence in support of the latter two requirements was lacking.

When discussing the applicability of the limited defense afforded by section 11362.775, *Colvin*, *Jackson*, and *Solis* placed heavy reliance on guidelines issued by the Attorney General under section 11362.81, subdivision (d).  (Guidelines for the Security and Non-diversion of Marijuana Grown for Medical Use (Aug. 2008) (<http://ag.ca.gov/cms_attachments/press/pdfs/n1601_medicalmarijuanaguidelines.pdf>); hereafter *Guidelines*.)  The Guidelines, which "'are entitled to considerable weight'" (*People v. Hochanadel* (2009) 176 Cal.App.4th 997, 1011), define a cooperative as an entity "properly organized and registered as . . . a corporation" that is "'democratically controlled and . . . primarily for their members as patrons.'  [Citation.]" (*Guidelines*, § IV.A.1, p. 8.)  It "must follow strict rules on organization, articles, elections, and distributions of earnings, and must report individual transactions from individual members each year.  [Citation.]"  (*Ibid*.)  A collective is defined as "'a business, farm, etc., jointly owned and operated by the members of a group[,]'" that "facilitates the collaborative efforts of patient and caregiver members — including the allocation of costs and revenues."  (*Id.*, IV.A.2 p. 8.)  Both cooperatives and collectives "should only provide a means for facilitating or coordinating transactions between members."  (*Id.*, IV.A.1 & 2 p. 8.)

In addition, the Guidelines recommend these entities "be organized with sufficient structure to ensure security, non-diversion of marijuana to illicit markets, and compliance with all state and local laws."  (*Guidelines*, § IV.B, p. 9.)  Among the

14

suggested steps, the Attorney General urged collectives and cooperatives "acquire marijuana only from their constituent members," implementing "a closed-circuit of marijuana cultivation and consumption" that "document[s] each member's contribution of labor, resources, or money to the enterprise." (*Id.*, IV.B.4, p. 10.) For reimbursement, the Guidelines recommend these entities charge "fees that are reasonably calculated to cover overhead costs and operating expenses . . . ." (*Id.*, IV.B.6, p. 10.) Finally, on the operation of a dispensary, the Attorney General stated: "It is the opinion of this Office that a properly organized and operated collective or cooperative that dispenses medical marijuana through a storefront may be lawful under California law, but . . . dispensaries that do not substantially comply with the guidelines . . . are likely operating outside the protections of Proposition 215 and the MMP . . . . For example, dispensaries that merely require patients to complete a form summarily designating the business owner as their primary caregiver — and then offering marijuana in exchange for cash 'donations' — are likely unlawful." (*Id.*, IV.C.1, p. 11.)

Defendant failed to provide sufficient evidence either the Sacramento dispensary or All-American complied with the statutory requirements for lawfully cultivating and distributing medical marijuana. While claiming to be a member of a Sacramento dispensary, he presented no evidence concerning the nature of that organization. In addition, his description of how it reimbursed him for the marijuana delivery, "put[ting] it up on the board and ask[ing] for contributions," and then giving him "what [it] collected from [the] members," reflects the Sacramento dispensary effectively "offer[ed] marijuana in exchange for cash 'donations,'" contrary to the Attorney General's Guidelines. (*Guidelines*, IV.C.1, p. 11.)

Before trial, the defense identified defendant as a member of All-American, but provided no further information on its status or operation. During trial, it presented documentation defendant belonged to All-American, that it had filed as a nonprofit

corporation with the Secretary of State, and its articles of incorporation described All-American's purpose was the collective and cooperative cultivation and distribution of medical marijuana. But there was no evidence concerning the process All-American employed to ensure its membership consisted of only persons qualified to use medical marijuana, or describing either its finances or operation. *Jackson* recognized that "in determining whether a collective or cooperative is a nonprofit enterprise, its establishment as such" through "[a]n operator's testimony as to the nonprofit nature of the enterprise," or the introduction of "any financial records . . . will be relevant, including in particular any processes or procedures by which the enterprise makes itself accountable to its membership." (*People v. Jackson, supra,* 210 Cal.App.4th at p. 539.) "[B]y the same token, the absence of fairly complete financial records and any accountability to members will also be relevant . . . ." (*Ibid.*) Here, the lack of documentation precludes defendant from relying on his All-American membership to establish a defense to the charges.

Further, the evidence indicated defendant operated as a marijuana wholesaler, merely joining dispensaries to distribute his marijuana without any other involvement in a cooperative or collective. He did not live near either dispensary, segregate the marijuana grown for each one, nor had an agreement with them on how much to grow or when to deliver it. Defendant did not obtain his own medical marijuana from either dispensary. Rather, he set aside nearly one-half of his crop for his personal use and that of three other individuals, none of whom were identified as belonging to either All-American or the Sacramento dispensary. Defendant claimed he "was entitled to reasonable compensation for his costs," which Britt estimated to be between $200 and $1,600 for an outdoor operation. But this amount included labor, not merely reimbursement for overhead and operating expenses as authorized by the Attorney General's Guidelines. Further, the evidence showed the amount defendant received

16

varied. The Sacramento dispensary gave him a little less than $1,400 per pound. There was evidence defendant was seeking $1,600 per pound from All-American.

Consequently, we conclude defendant failed to present sufficient evidence to support instructing the jury on either a caregiver or medical marijuana affirmative defense.

DISPOSITION

The judgment is affirmed.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

BEDSWORTH, J.

FYBEL, J.

17