Filed 12/11/15  P. v. Manson CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B253254 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA059036) |
| v. | |
| ARSEN MANSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bernie C. LaForteza, Judge.  Affirmed in part, reversed in part and remanded with directions.

Alan Stern, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

_____

**SUMMARY**

Arsen Manson appeals from a judgment entered after a jury convicted him of four counts of selling or offering to sell marijuana (Health & Saf. Code, § 11360, subd. (a)), and one count each of possession of marijuana for sale (§ 11366), transportation of marijuana (§ 11360, subd. (a)), maintaining a place for selling marijuana (§ 11366), and misdemeanor battery (Pen. Code, § 242).

We affirm in part and reverse in part.

**FACTS AND PROCEEDINGS BELOW**

Appellant represented himself in propria persona at trial with the assistance of a translator.

## I.     Prosecution Evidence

Appellant opened a marijuana dispensary called "Health Bud Pro" in Lancaster on or about January 12 or 13, 2013.  The dispensary operated seven days a week until March 14, 2013, when deputies from the Los Angeles Sheriff's Department executed search and arrest warrants.

### A.  Civilian Witnesses

Appellant opened the dispensary with the help of Olin Randall Hanson and Emily Perez, Hanson's girlfriend, who both had experience working in other medical marijuana dispensaries and who wanted to become partners in or invest in a medical marijuana dispensary.  Hanson and Perez contributed $10,000 cash and six pounds of marijuana to start the business with the understanding that Hanson would be "half partners" with appellant, receiving half of the income from the dispensary, and Perez would receive $10,000 per month.[1]

Hanson understood from his prior experience that dispensaries were nonprofit and could only provide marijuana to people who joined the cooperative with verified authorizations from doctors and filled out required paperwork.  As members of the

---

[1] Appellant never paid Hanson or Perez any money from the business.

2

cooperative, patients had certain rights and responsibilities and a board of directors ran the cooperative. Perez understood that "verifying recommendations" was essential to running a legal marijuana dispensary and accurate record keeping was critical.[2]

After it opened, the business caught on and grew. It operated on a cash basis and Hanson or Perez counted the money in the cash register at the end of the day and turned the money over to appellant who would put it in his pocket. Hanson estimated during the first week on a slow day he counted $1,000 to $1,200 and on a good day between $3,000 and $4,000. Perez indicated she counted between $3,000 to $4,000.

When Perez expressed to appellant concern about following correct practices, appellant complained that she was ruining his business and stated "everybody's money is good here." Perez observed appellant selling marijuana at the dispensary without asking for identification or "authorization." Hanson also observed appellant selling to customers who did not have proper authorization, telling Hanson that it was okay because he knew the people. Hanson and Perez's association with appellant's dispensary ended on January 26, 2013, after appellant became angry with Perez and choked her in front of Hanson and Erika Duran, a friend of Perez and Hanson.[3]

Duran was at the dispensary on two or three occasions but did not participate in selling marijuana, although she did help write prices for marijuana on a dry-erase board. She observed appellant sell marijuana usually without asking for identification from customers, and when he did ask, he simply looked at it and hand it back without taking steps to verify the information before completing the transaction.

Norma Wagers, a customer, testified that she showed appellant her paperwork the first time she went to appellant's dispensary in January or February 2013 and appellant

_____

[2] "Verifying" referred to calling a doctor's office to confirm that a patient is authorized to use medical marijuana and the authorization had not expired.

[3] The jury convicted appellant of misdemeanor battery and found him not guilty of criminal threats. On appeal, appellant does not challenge the misdemeanor battery conviction.

made photocopies, but in 10 to 15 subsequent visits to the dispensary appellant[4] never asked for her identification or her medical marijuana recommendation and he did not look her up in any paperwork or on the computer before making the sale.[5] When Wagers expressed concern to appellant about the lack of organization of the paperwork and the legality of his operation, appellant told her not to worry about it and that "he had it taken care of." Nonetheless, in early March 2013, Wagers volunteered to try to organize appellant's paperwork and, while working on a laptop computer at the dispensary, observed five to 10 transactions a day where customers were allowed to purchase marijuana without proper paperwork. Wagers tried to tell customers who came in without their recommendation or without their identification that they needed to come back but appellant would let them make their purchase. Wagers received two grams of marijuana total for her four days of work.

Jason Orta was a customer at appellant's dispensary who later worked as security outside the dispensary and inside selling marijuana in exchange for one gram of marijuana a day.[6] If a person did not have the proper paperwork, Orta would tell appellant and appellant would let them in saying it was okay.

Alejandro Robles was a customer at appellant's dispensary who also had owned several retail businesses. Appellant asked Robles for help paying his state sales taxes but Robles could not get an exact number for appellant's sales because the records were incomplete. Robles also served as a courier picking up marijuana purchased for appellant's dispensary from a store in Santa Clarita, but had no role in paying for the marijuana as appellant made the arrangements. Robles estimated appellant's dispensary

---

[4] Wagers stated that she might have bought from someone other than appellant on one occasion.

[5] In contrast, Wagers described her experience at two other dispensaries; one required her to show her recommendation and identification every time and the other kept the recommendation on file and required her to show her identification.

[6] Orta pled guilty to sales of marijuana in exchange for a probationary sentence without any additional jail time in exchange for his promise to testify if subpoenaed.

had a profit margin of 10 to 15 percent, and possibly as high as 20 percent. Robles was given marijuana for his work.

**B. Law Enforcement Witnesses**

On January 23, 2013, Los Angeles County Sheriff's Deputy Mark Donnel and his partner went to meet appellant at his dispensary to follow up on a written report from appellant that he had been the victim of a robbery at gunpoint the previous evening. After describing the robbery, appellant told Deputy Donnel that he might have paperwork related to one of the robbers who might have been at the dispensary the day before the robbery and retrieved a stack of copies of marijuana recommendations, but the copies were not organized or annotated in any way and did not indicate who had been to the dispensary the day before. When Deputy Donnel asked how much money the dispensary made, appellant responded, "Give me a month and I'll make you $10,000."

Deputy Donnel told Sergeant Steven Owen, the investigating officer in this case, that he was concerned about how appellant's dispensary was being run and on February 20, 2013, Sergeant Owen went to the dispensary to speak with appellant about the robberies and his business. When Sergeant Owen asked how much money a day appellant was making selling marijuana, appellant said he was making $500 a day in profit. Appellant showed Sergeant Owen the dispensary, including the sales room where there was marijuana and a dry erase board with prices. Appellant told Sergeant Owen that he would go to Los Angeles to buy marijuana and drove it in his van to the dispensary and that at the end of the day he would take the unsold marijuana back to his house.

The next day, February 21, 2013, Sergeant Owen again went to appellant's dispensary and after talking about the robbery, talked about how appellant's dispensary made money. Appellant stated that he bought marijuana from another dispensary, transported it back to his dispensary, and marked up the price. For example, appellant explained, if he purchased marijuana at $10 per gram, he would raise the price and sell it for $12 per gram or if he paid $240 per ounce he would mark up the price and sell it for $279 per ounce. Appellant indicated that he sold $1,000 worth of marijuana in a day and

5

$100 of that was pure profit. On a "good day," appellant's dispensary sold $3,000 to $5,000 worth of marijuana. Appellant told Sergeant Owen that selling marijuana was "big business" in terms of the "money you can make." Appellant told Sergeant Owen that the last time he had driven to Los Angeles to purchase marijuana was two days before their conversation on February 21, 2013. Appellant replenished his marijuana supply every couple days and also used "drivers" to transport the marijuana to his dispensary. The more marijuana appellant bought, the "better deal" he would get on the price.

That same day, February 21, 2013, Sergeant Owen had sheriff deputies participate in traffic stops of people leaving appellant's dispensary to see if they were in possession of medical marijuana authorization cards and if they had purchased legally. Among the customers stopped that day were Renae Campbell. Campbell, who received a marijuana ticket for possession of less than an ounce of marijuana, did not have her medical marijuana documentation with her because she just had to show her identification to purchase from appellant. Campbell had purchased marijuana from appellant's dispensary around 10 times.

On February 26, 2013, Sergeant Owen again went to appellant's dispensary and spoke to appellant. Appellant seemed confused about what was necessary for a legal marijuana cooperative, including whether a federal, state or county governing agency was responsible for them. Appellant identified himself as the president of the dispensary co-op, which had no other officers or members. Appellant said he had a lot of customers, was making $150-160 in profit a day, and paying $90 in unspecified taxes for every $1,000 he made. Appellant only talked about buying and transporting marijuana and did not mention growing marijuana.

On March 7, 2013, Sergeant Owen had Deputy Larry Pico go to appellant's dispensary with cash and keys, but no identification. Pico went to the dispensary twice that day. On the first visit, Pico was asked at the door if he had been to the dispensary before and Pico answered yes and was allowed inside. Appellant and another person were working at the sales counter, and after waiting for another customer to complete her

6

purchase, Pico bought $40 worth of one type of marijuana and $8 of another type without being asked for identification. On the second visit about three hours later, appellant asked Pico if he had been to the dispensary before, Pico said he had earlier that day and wanted to buy more of what he had tried, Pico was allowed in and purchased one-half ounce of marijuana from a worker for $100 after negotiating a $25 discount. Pico then asked if he could buy a larger quantity of marijuana at a price below the $225 per ounce listed price and appellant, who was present, responded that if Pico purchased a few ounces he could pay $180 per ounce and could come back later that day to get it.

That same day, March 7, 2013, Sergeant Owen and his partner parked outside appellant's dispensary and conducted traffic stops of customers, including Daniel Kincaid a passenger in one of the stopped vehicles. Kincaid, who was issued a citation, had just purchased $50 worth of marijuana from appellant's dispensary but did not have his authorization on him that day and was not asked for identification or his authorization by anyone at appellant's dispensary. Kincaid had been asked for his documentation the first time he went to appellant's dispensary but did not have to fill out any paperwork.

On March 14, 2013, Sergeant Owen and a team of deputies executed search and arrest warrants. Approximately three pounds of marijuana were found in a lockbox at the dispensary and analyzed by police.

A marijuana dispensary expert testified that a legal marijuana collective in California was a "jointly owned and operated entity working together towards the common goal of cultivation and the distribution of marijuana to its members" and where members reimbursed the collective for the convenience of someone helping provide the medical marijuana. In a legal cooperative, marijuana was cultivated by members and it cannot make a profit. It would be illegal to sell marijuana outside the membership group even to someone who had a medical authorization and it would be illegal to buy marijuana from one collective to sell it in another collective.

## II. Defense Evidence

Appellant showed evidence that Kincaid had a marijuana recommendation. Appellant testified that operating a marijuana business was a "new thing in California"

7

and no one knew much about it so when someone wants to open a marijuana business he finds a knowledgeable attorney for consultation. Moreover, the California Attorney General also provides rules for how to conduct the business properly. Appellant testified as to the difference between a for-profit and a non-profit organization, stating a nonprofit "can receive only donations, and they do not have to pay taxes from this amount. [¶] So that means that the profit, the surplus, is increased. This constitute nine percent, and every three months, you can spend this nine percent on—on the turnover, cash flow." Appellant conceded he was not "accurate" with the paperwork, saying papers were lost before and after the robberies. Appellant also testified about the high crime rate in Lancaster, hiring Orta, Robles and others and "training them to work correctly, without violating the law."

## III.    Conviction and Sentence

The jury convicted appellant of four counts of selling or offering to sell marijuana (Health & Saf. Code, § 11360, subd. (a))—count 1 was for the period between January 14, 2013 to March 14, 2013; in count 7 was for the February 21, 2013 offer to sell to Campbell; count 9 was for the March 7, 2013 offer to sell to Deputy Pico; and count 10, was for the March 7, 2013 offer to sell to Deputy Pico. The jury also convicted appellant in count 2 of possession of marijuana for sale (§ 11366), count 3 of transportation of marijuana (§ 11360, subd. (a)), count 4 of maintaining a place for selling marijuana (§ 11366), and count 6 of misdemeanor battery (Pen. Code, § 242).

The trial court initially sentenced appellant on November 22, 2013, to an aggregate term of four years and six months in local county custody under Criminal Justice Realignment Act of 2011 (Realignment Act) (Pen. Code, § 1170, subd. (h)).[7] On December 24, 2013, the trial court determined it had erroneously sentenced appellant under the Realignment Act to local custody and resentenced appellant to the same aggregate term to be served in state prison.

Appellant filed a notice of appeal.

---

[7] All further statutory references are to the Penal Code unless otherwise indicated.

8

**DISCUSSION**

On appeal, appellant argues that his convictions of offers to sell marijuana under counts 7, 9 and 10 are barred by section 954, the cumulative effect of four instructional errors is prejudicial, he was incorrectly sentenced to state prison rather than local custody under section 1170, subdivision (h), and the removal of standby counsel was in error. We agree with appellant's sentencing error claim. In all other respects, we affirm.

**I.      Claim of Section 954 Error**

Appellant was charged and convicted under section Health and Safety Code section 11360, subdivision (a) for sale, offer to sell, or transportation of marijuana in count 1 during the period between January 14, 2013, and March 14, 2013, and also convicted under section 11360, subdivision (a) in count 7 for the sale or offer to sell to Campbell on February 21, 2013, in count 9 for the sale or offer to sell to Deputy Pico on March 7, 2013, and in count 10 for a second sale or offer to sell to Deputy Pico on March 7, 2013. Appellant contends that under section 954 the trial "court should [have] precluded the prosecutor from alleging individual sales charges (counts 7, 9 and 10) that were **necessarily included** within . . . the general timeframe charge for the same offense contained in count 1. In essence, the court should have informed the prosecutor that he had two options, to either elect between the general timeframe charge or the necessarily included individual sales charges and any other individual sales charges the prosecutor could establish based on the evidence." We do not believe section 954 requires such an election.

Section 954 provides: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court . . . ." (§ 954.) Thus, as the Supreme Court has stated, "[s]ection 954 generally permits multiple

9

conviction."[8] (*People v. Reed* (2006) 38 Cal.4th 1224, 1227; see *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1518 [collecting cases where courts have found section 954 to allow multiple convictions for crimes that do not treat harm or damage as one of their elements—even if the crimes are part of the same impulse, intention or plan—as long as each conviction reflects a completed criminal act].) "A judicially created exception to the general rule permitting multiple conviction 'prohibits multiple convictions based on necessarily included offenses.'" (*People v. Reed*, *supra*, 38 Cal.4th at p. 1227.) Thus, "if a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former." (*Ibid.*)

This case does not involve a lesser included offense.[9] Rather, it involves multiple acts or violations of the same statute. As appellant acknowledges, the cases he cites reversing multiple convictions "involved a single occurrence." (See, e.g., *People v. Coyle* (2009) 178 Cal.App.4th 209, 217 [in case involving three counts of murder based on one victim, court noted the three courts charged a single offense, murder, on alternate theories]; *People v. Ryan* (2006) 138 Cal.App.4th 360, 369 [in case involving two counts for each forged check, stating court had "found no case permitting multiple forgery convictions, with respect to a single instrument"].) Here, appellant's acts are not limited to the three specific instances of offering to sell marijuana described in counts 7 (Campbell on Feb. 21, 2013), 9 (Pico on Mar. 7, 2013) and 10 (Pico a second time on Mar. 7, 2013); appellant operated a marijuana dispensary during the general timeframe alleged in count 1 (Jan. 14, 2013 & Mar. 14, 2013) and there was extensive evidence, as summarized above, that throughout the operation of the dispensary, appellant was

---

[8] The counterpart to section 954 is section 654 which prohibits multiple punishments for the same act or omission. (§ 654; *People v. Reed*, *supra*, 38 Cal.4th at p. 1227.) "When section 954 permits multiple conviction, but section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited." (*People v. Reed*, *supra*, 38 Cal.4th at p. 1227.)

[9] Although the jury was instructed on a lesser included offense of misdemeanor simple possession of marijuana, it convicted appellant only of the greater crimes.

offering to sell and sold marijuana on numerous occasions to various individuals other than on the dates and to the persons specified in counts 7, 9 and 10.[10]

## II.  Instructional Error Claims

Appellant makes four claims of instructional error.  On appeal, we apply a de novo standard of review for claims of instructional error.  (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; *People v. Alvarez* (1996) 14 Cal.4th 155, 217.)

### A.  Offering to Sell Instruction

Appellant's first claim of instructional error is based on the trial court's use of CALCRIM No. 2351 as to counts 1, 7, 9 and 10.  Specifically, appellant contends that No. 2351 applies to an offer to sell rather than actual sales of marijuana and that the court should have instructed the jury on actual sales under CALCRIM No. 2350.  We find no error.

The elements for selling marijuana are (1) defendant sold a controlled substance; (2) defendant knew of its presence; (3) defendant knew of the substance's nature or character as a controlled substance; and (4) the controlled substance was marijuana. (CALCRIM No. 2350.)  The elements for offering to sell marijuana are (1) defendant offered to sell marijuana, a controlled substance; and (2) when the defendant made the offer, he intended to sell the controlled substance.  (CALCRIM No. 2351.)

In general, "'[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'"  (*People v. Hart* (1999) 20

---

[10] In arguing that section 954 prohibits a prosecutor from electing to charge a defendant with counts based on specific instances as well as a general timeframe charge, appellant notes that the jury was "not instructed that the specific instances of sales related to counts 7, 9, and 10 could not also be used to convict appellant of the general timeframe charge contained in count 1," the jury might have concluded that because he was guilty of the individual sales counts he was "necessarily also guilty of the separate timeframe charge contained in count 1."  To the extent appellant raises an instructional error claim, any alleged error was harmless as it is not reasonably probably that appellant would have obtained a more favorable result absent the error in light of the extensive evidence beyond the three specific instances charged in counts 7, 9, and 10. (See section II, *post*.)

Cal.4th 546, 622; *People v. Anderson* (2007) 152 Cal.App.4th 919, 927. ["Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights"].) Here, there is no dispute that CALCRIM No. 2351 is a correct statement of the law. Appellant did not object to the trial court's jury instruction using CALCRIM No. 2351. Moreover, while the evidence may have also supported an instruction charging appellant with completed sales, the evidence nonetheless supported the jury's finding as to each element of the offense of an offer to sell marijuana.

## B. Transportation Instruction

As to count 3, the transportation charge, appellant contends the trial court erred in again using CALCRIM No. 2351 applicable to offers to sell marijuana.

The record shows that the trial court included count 3 with counts 1, 7, 9 and 10 as charging appellant with "offering to sell marijuana," and did not otherwise instruct the jury on count 3's transportation charge. The Attorney General's office concedes that it "appears that the trial court failed to instruct the jury on transportation under Health and Safety Code section 11360, subdivision (a)," but argues that the error was not prejudicial because the evidence showed that appellant transported marijuana himself and also had others transport marijuana for him.

Appellant appears to concede that none of the alleged instructional errors standing alone would be deemed prejudicial under *People v. Watson* (1956) 46 Cal.2d 818, 836 [the verdict must be upheld unless it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred].) And as discussed above and below, we find no error in the other instruction claims.

In any event, it does not appear reasonably probable that appellant would have obtained a more favorable outcome absent the transportation instruction error. The elements for transporting marijuana, are (1) defendant transported a controlled substance; (2) defendant knew of its presence; (3) defendant knew of the substance's nature or character as a controlled substance; (4) the controlled substance was marijuana; and (5) the marijuana possessed by defendant weighed more than 28.5 grams. (CALCRIM No. 2361.) Here, the jury also returned a guilty verdict on count 2 for possession for sale of

12

marijuana, finding, inter alia, elements (2) through (4)—that defendant knew of the presence of the controlled substance, knew the substance's nature or character as a controlled substance, and the controlled substance was marijuana. (Compare CALCRIM Nos. 2352 & 2361.) Moreover, the evidence included testimony from Sergeant Owen that appellant stated that "every couple days" appellant bought marijuana from dispensaries in Los Angeles and he or "his drivers" would bring the marijuana to his dispensary by car and, at the end of each day, he would move any unsold marijuana to his house. Appellant also told Sergeant Owen that the more marijuana he bought, the cheaper price or "better deal" he would get, explaining if he paid $10 for a gram of marijuana, he would sell it for $12 per gram and likewise that "he'll pay $240 for an ounce, he'll mark up the price and sell it for $279 an ounce." Under these circumstances, it is not reasonably probable that appellant would have obtained a more favorable outcome absent the trial court's error.

### C. Aiding and Abetting Instruction

Appellant next contends the trial court erred in failing to instruct the jury sua sponte on aiding and abetting liability. We disagree.

"""[I]n criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case."""" (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) The duty to instruct, sua sponte, on general principles closely and openly connected with the facts before the court encompasses an obligation to instruct on all essential elements of the charged offense where it relates to a material issue presented by the evidence. (*People v. Banks* (1983) 147 Cal.App.3d 360, 367.) Generally, "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." (§ 31.) As our Supreme Court has explained, "[i]nstructions on aiding and abetting are not required where '[t]he defendant was not tried as an aider and abettor, [and] there was

13

no evidence to support such a theory . . . .'" (*People v. Young* (2005) 34 Cal.4th 1149, 1201, quoting *People v. Sassounian* (1986) 182 Cal.App.3d 361, 404.) Here, appellant was tried on the theory that he was a direct perpetrator of the crimes and no evidence was presented suggesting that appellant merely acted as an aider and abettor. Thus, the trial court did not err in not sua sponte instructing the jury on an aiding and abetting theory.

### D. Medical Marijuana Program Act (MMPA) Defense Instruction

Finally, appellant argues that the trial court erred when it declined to give an MMPA defense instruction. We find no error.

The MMPA bars individuals and any collective, cooperative, or other group from transforming medical marijuana projects authorized under the MMPA into for-profit enterprises. (*Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 746; Health & Saf. Code, § 11362.765, subd. (a) ["nothing in this section shall authorize . . . any individual or group to cultivate or distribute marijuana for profit"].) "The law does not sanction sales for profit even between members of the same collective who each have a physician's marijuana recommendation." (*People v. Sandercock* (2013) 220 Cal.App.4th 733, 739; see *People v. Solis* (2013) 217 Cal.App.4th 51, 54 [defendant who admitted receiving $80,000 in personal income from marijuana collective not entitled to MMPA instruction]; *People v. Jackson* (2012) 210 Cal.App.4th 525, 538 ["there is little doubt the Legislature did *not* intend to authorize [MMPA] profit-making enterprises"]; *People v. Colvin* (2012) 203 Cal.App.4th 1029, 1040-1041 [137 Cal.Rptr.3d 856], quoting Guidelines, § IV.B.5 at p. 10 ["'[a]ny monetary reimbursement that members provide to the collective or cooperative should only be an amount necessary to cover overhead costs and operating expenses'"]; *People v. Baniani* (2014) 229 Cal.App.4th 45, 61 [under MMPA, "sales for profit remain illegal"].)

Before trial, the court informed appellant that if he had "competent evidence as to your defense that you conducted your activities within the Compassionate Use Act and The Medical Marijuana Program Act," then he was free to present the evidence subject to

the Evidence Code.[11] Later, in discussing jury instructions, the court asked appellant if he was requesting the instruction on the MMPA defense, appellant responded, "What defense? Oh, no, I don't want any defense." Although appellant on appeal notes that his claims of profit to Deputy Owen could be no more than braggadocio and may not have factored in the expenses and costs of operating the dispensary, at trial appellant never provided evidence to support these theories. Appellant's testimony at trial did not address his dispensary's profit—or lack of profit—or the costs of its operation to dispute the prosecution evidence that he was making a profit on the marijuana sales.[12]

Moreover, the MMPA also assumes that the collective or cooperate is cultivating the marijuana, rather than purchasing marijuana from outsiders. (Health & Saf. Code, § 11362.775 [qualified individuals "who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions"].) Thus, the guidelines issued by the Attorney General state that "The collective should not purchase marijuana from, or sell to, non-members; instead, it should only provide a means for facilitating or coordinating transactions between members." (Cal. Atty. Gen., Guidelines for the Security and Non-diversion of Marijuana Grown for Medical Use (Aug. 2008), § IV.A.2., p. 8.)[13] "Cooperatives and collectives should acquire marijuana only from their constituent members, because only marijuana grown by a qualified patient or his or her

---

[11] The trial court also told appellant that he could not present hearsay evidence of advice from his civil attorney about establishing his dispensary.

[12] Rather, his testimony talked generally about the Attorney General's Guidelines and advice from an attorney on how to set up a nonprofit marijuana business, and included the statements that a "nonprofit organization can only receive donations, and they do not have to pay taxes from this amount" and that profit of 9 percent could be spent every three months on "turnover, cash flow."

[13] These guidelines, while not binding, have been given considerable weight by the courts when determining whether an operation qualifies as a collective under the MMPA. (*People v. Colvin*, *supra*, 203 Cal.App.4th at p. 1040, fn. 11; *Qualified Patients Assn. v. City of Anaheim*, *supra*, 187 Cal.App.4th at p. 748.)

primary caregiver may lawfully be transported by, or distributed to, other members of a collective or cooperative (§§ 11362.765, 11362.775). The collective or cooperative may then allocate it to other members of the group. Nothing allows marijuana to be purchased from outside the collective or cooperative for distribution to its members. Instead, the cycle should be a closed-circuit of marijuana cultivation and consumption with no purchases or sales to or from non-members." (Guidelines, § IV.B.4., p. 10, italics added.) Appellant's testimony did dispute the prosecution's evidence that the dispensary was buying marijuana from outside dispensaries to re-sell.

In light of the evidence at trial, we find no error in the trial court's decision not to instruct on the MMPA defense.[14]

### III. Sentencing Error Claim

Appellant contends under the Realignment Act (§ 1170, subd. (h)), he should have been sentenced to the county jail, and not state prison. Specifically, appellant contends that the trial court erred in sentencing him to state prison based on the stayed sentence in count 4. We agree.

#### A. Relevant Trial Court Proceedings

At the sentencing hearing on November 22, 2013, the trial court sentenced appellant to the high term of four years on count 1, a consecutive term of six months on count 6, and to the midterm on counts 2, 3, 4, 7, 9 and 10 but stayed those sentences under section 654. The court ordered appellant to serve his aggregate term of four years and six months in local county custody.

A month later, on December 24, 2013, the trial court held another hearing, stating that it had found a mistake because the court had sentenced appellant on count 4 (maintaining a place for selling controlled substance) to the midterm of two years and

---

[14] In a footnote, appellant argues that the trial court's inclusion of an instruction on an "MMPA defense" with respect to the lesser included charge of misdemeanor simple possession of marijuana shows that the court's decision not to give the MMPA defense as to the greater charges was "illogical." The court, however, did not give an MMPA defense as to the simple possession charge; rather it gave an instruction that under the Compassionate Use Act possession was lawful under certain circumstances.

16

Health and Safety Code section 11366 provides that it "'shall be punished by imprisonment in county jail for [a period] not more than one year or state prison" (Health & Saf. Code, § 11366) and the Realignment Act did not apply to count 4. The trial court noted that since it had imposed state prison on count 4, the court's understanding was that appellant was required to serve his sentence in state prison rather than local custody and therefore changed appellant's sentence.

### B. Relevant Law

Section 654, subdivision (a) provides, "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Thus, as the Supreme Court held "when a court determines that a conviction falls within the meaning of section 654, it is necessary to impose sentence but to stay the execution of the duplicative sentence." (*People v. Duff* (2010) 50 Cal.4th 787, 796; *People v. Hernandez* (2005) 134 Cal.App.4th 1232, 1238-1239 [if section 654 applies, the proper procedure is to impose a concurrent term and then stay it].) In other words, when section 654 applies, the trial court may impose only one sentence. (See *Neal v. State of California* (1960) 55 Cal.2d 11, 19.)

Here, the trial court stayed the concurrent sentences, including under count 4. That sentence, under Health and Safety Code section 11366, was not subject to the Realignment Act and required that appellant's imprisonment be served in state prison rather than local custody. Under section 669, subdivision (d), "When a court imposes a concurrent term of imprisonment and imprisonment for one of the crimes is required to be served in the state prison, the term for all crimes shall be served in the state prison, even if the term for any other offense specifies imprisonment in a county jail pursuant to subdivision (h) of Section 1170." The parties dispute whether this section requires appellant's imprisonment—for four years on count 1, a Health and Safety Code section 11360, subdivision (a) offense that is subject to the Realignment Act—be served in state prison, rather than county jail. We hold that it does not.

Section 669, subdivision (d) provides concurrent terms of imprisonment "shall be served in the state prison."  In appellant's case, the term for count 4 is stayed under section 654 and will not be served unless the stay is removed.  "'It has long been established that the imposition of concurrent sentences is precluded by section 654 [citations] because [under such a sentence] the defendant is deemed to be subjected to the term of both sentences although they are served simultaneously.'"  (*People v. Duff*, *supra*, 50 Cal.4th at p. 796.)  If section 654's prohibition against duplicative punishment is to be effectuated, we do not believe appellant can be subjected to the state prison requirement stayed in count 4, in addition to the punishment imposed under count 1.

## IV.    Removal of Standby Counsel Claim

Finally, appellant contends that the trial court abused its discretion when it relieved standby counsel for what he characterizes as a "minor transgression" prior to the jury being instructed and that the error was prejudicial at sentencing and resentencing. We find no abuse of discretion.

### A.  Relevant Trial Court Proceedings

Appellant elected to forgo the assistance of counsel and to represent himself at trial in the trial court.  Specifically at an October 7, 2013 hearing prior to trial, appellant was represented by Gary Symonds who sought a continuance because he was scheduled to start another trial; however, when the court asked appellant if he would agree to a continuance, appellant stated he wanted to proceed in propria persona and did not want Symonds to represent him.  After a break to allow appellant to review and sign the *Faretta* waiver with the assistance of a translator, the court conducted a colloquy during which, inter alia, the court explained—and appellant stated he understood—that appellant "would not be able to have co-counsel."  "So you can talk to whomever you want to on your [own] time.  But when you are before the court, you'll be the only one sitting there acting as you own attorney.  You won't be able to have any type of assistance other than someone who substitutes in for all purposes sitting in with you.  There's no advisory counsel allowed to remain at counsel table with you."  Symonds was present for the

entire colloquy. Appellant's *Farretta* motion was granted and Symonds was relieved as counsel.[15]

On October 24, 2013, after the trial court excluded appellant's evidence of his retention of an attorney to help him establish his marijuana dispensary, reasoning that the attorney's statements were hearsay and the documents were irrelevant as certain requirements must be met to qualify under the MMPA, Symonds—who was now serving as appellant's standby counsel—asked the court to be heard. The trial court responded, "you're stand-by counsel. You don't have standing to be heard. So please have a seat."

The next day, on October 25, 2013, during a discussion outside the presence of the jury between the court, the prosecutor and appellant about jury instructions, Symonds offered, "as stand-by counsel, maybe I can go over these and assist him." The court responded that it appreciated that Symonds was trying to be of assistance, "but, again, you're not representing the defendant. You're merely here as stand-by. I'm not going to order you not to talk to the defendant, but it's entirely up to the defendant whether he talks to you or not. But you really should not be giving him any advice."

Later, in the afternoon on October 25, 2013, after the close of evidence, the trial judge paused the proceedings and briefly left the courtroom to print the jury instructions to read. When the judge returned to the bench, the prosecutor asked to speak to the court outside the presence of the jury. After the jury exited, the prosecutor informed the court that while the judge was out of the room, Symonds leaned over the bar and told the interpreter to tell appellant to ask for special instructions. The prosecutor went on to say that "stand-by counsel may have any conversation he chooses to have with [appellant].

---

[15] On October 7, 2013, after Robert Nadler was appointed as standby counsel, the court informed appellant that "you cannot consult in any way with Mr. Nadler. He cannot give you any legal advice. He cannot answer any questions for you. He will sit quiet throughout the proceedings until such time, if ever, you have elected to have him appointed." At an October 9, 2013 hearing on pre-trial motions, appellant asked to "consult" with standby counsel, and the court responded, "You cannot. You waived your right to have an attorney. [¶] Mr. Nadler is only here as stand-by counsel. Now, if you want to relinquish your pro per status, . . . Mr. Nadler can step in and be your attorney." Appellant declined to do so.

19

However, he is not engaged by this court as an assisting counsel, and the People believe it is inappropriate in his capacity as stand-by counsel to make such a verbal display with the [appellant] through the interpreter while the court is away from the bench."

The court responded, "Well, in light of that, Mr. Symonds, you're relieved. Thank you very much for your services." The court then proceeded to rule on jury instruction and to instruct the jury.

At sentencing on November 22, 2013, the trial court indicated that its tentative decision was to sentence appellant to a midterm sentence of three years on count 1, but after argument from appellant and the prosecution,[16] sentenced appellant to the upper term of four years on count 1 based on two aggravating factors.[17]

## B. Relevant Law

As appellant correctly states, the United States Constitution guarantees the right of self-representation and the right to assistance of counsel (*Faretta v. California* (1975) 422 U.S. 806, 834), but a defendant "has no right, under either the federal or state Constitution, to 'hybrid representation.' Criminal defendants have the constitutional right to have an attorney represent them, and the right under the federal Constitution to represent themselves, but these rights are mutually exclusive." (*People v. Moore* (2011) 51 Cal.4th 1104, 1119-1120, fn. omitted; *Brookner v. Superior Court* (1998) 64 Cal.App.4th 1390, 1394 ["It seems to us that a defendant either has an attorney or he is his own attorney–period"].) Likewise, appellant correctly concedes that California law distinguishes between the roles of standby and advisory counsel: "'Standby counsel' is an attorney appointed for the benefit of the court whose responsibility is to step in and

---

[16] Appellant in essence accused that the court, as well as the prosecutor and Deputy Owen, of "breaking the law" and causing "huge damage[s]" for the loss of his house and property he said was worth "hundred thousand of dollars." The prosecution argued for a longer sentence, noting that the court was showing compassion in its tentative decision but that such compassion was unwarranted given appellant's aggressive behavior and inflammatory accusations.

[17] The court noted the manner in which the crime was carried out indicated planning, sophistication or professionalism and it involved a large quantity of contraband.

represent the defendant if that should become necessary because, for example, the defendant's in propria persona status is revoked. [Citations.] 'Advisory counsel' by contrast, is appointed to assist the self-represented defendant if and when the defendant requests help." (*People v. Blair* (2005) 36 Cal.4th 686, 725, disapproved on another point in *People v. Black* (2014) 58 Cal.4th 912, 919-920.)

Nonetheless, appellant argues that the trial court abused its discretion by dismissing Symonds based on "this single minor transgression" and should have simply warned Symonds not to attempt to communicate with appellant through the translator, thus protecting "appellant's long-standing grant of stand by counsel." This error, appellant argues, was prejudicial because he could not confer with standby counsel prior to sentencing. But as discussed, standby counsel is appointed for the benefit of the trial court, not to assist appellant as an advisory counsel would. (See *People v. Clark* (1992) 3 Cal.4th 41, 149 ["The court was not required to appoint advisory counsel to assist defendant. [Citation.] Rather, the court appointed . . . standby counsel *for the benefit of the court* in case it became necessary for counsel to step in and complete the trial"].) Thus, there would have been no right to confer with or receive advice from standby counsel at the sentencing hearing or at any other point in the proceedings. Moreover, the record shows that Symonds had been put on notice on at least two other occasions that he was there as standby counsel only and was not appointed as advisory counsel. In this context, we find no abuse of discretion.[18]

---

[18] Appellant suggests that he could have elected to relinquish his in propria persona status at sentencing but the trial court "did not make him aware of this option." The court, however, informed appellant on two occasions when appellant attempted to seek advice from standby counsel that standby counsel could not assist appellant but could step-in as his attorney if appellant elected to relinquish his pro. per. status. In addition, at his *Farretta* hearing, the court told appellant that if he "decide[d] sometime down the line to re-accept an attorney represent you, the court will not allow any continuances . . ." and that if appellant "asked for an attorney sometime down the line, the court may deny this request and order to you to proceed without an attorney." Thus, appellant had been made aware that he could request re-appointment of counsel. Moreover, it is not as clear as appellant's suggestion on appeal that, if Symonds had not been removed as standby counsel, appellant would have requested Symonds' re-

**DISPOSITION**

The judgment is affirmed in part and reversed in part. The case is remanded for resentencing consistent with this opinion. We direct the clerk of the superior court to issue an amended abstract of judgment reflecting the resentencing and to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


CHANEY, Acting P. J.


We concur:


JOHNSON, J.


MOOR, J.[*]

---

appointment given appellant's apparent low opinion of counsel, including telling the trial court at his December 24, 2013 sentencing, "My first lawyer was high on heroine [*sic*], and you appointed him, and you wanted him to assist me, and he soiled his pants."

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.